[L. A. No. 9479. In Bank.—September 23, 1929.]

MARIE JULIE PELLISSIER, Respondent, v. TITLE GUARANTEE AND TRUST COMPANY (a Corporation), Defendant and Respondent, and EMMA SUMMERS et al., Appellants.

I. Henry Harris for Appellants.

Dennis & Griffith and Lawler & Degnan for Respondent.

E. W. Sargent and J. F. Keogh for Respondent Title Guarantee and Trust Company.

PRESTON, J.—After a careful reconsideration of this cause, we are pleased to adopt the opinion of Mr. Justice Plummer of the Third Appellate District as the opinion of this court in bank.

"The plaintiff's complaint in this action sets forth the incorporation of the Title Guarantee & Trust Company; that prior to the date hereinafter mentioned the plaintiff was the owner in fee simple of all that certain real property described as the west half of the northwest quarter of section 25, township 1 south, range 14 west, S. B. M.,

in the county of Los Angeles; that on or about the ———
day of February, 1913, the plaintiff executed and delivered
to the defendant Title Guarantee & Trust Company an in-
strument absolute in form, conveying all of said property
to the Title Guarantee & Trust Company; that upon the
same date an agreement in writing was entered into between
the plaintiff and the Title Guarantee & Trust Company,
wherein and whereby it was agreed that said conveyance,
though absolute in form, was made in trust; that no
consideration was paid therefor; that the title to said prop-
erty was held in trust by the Title Company for the benefit
of the plaintiff; that the conveyance was made by the
plaintiff to the Title Company for the purpose of enabling
the Title Company to subdivide and make sales of lots
in said tract, to such persons, at such prices, and upon such
terms as the Title Company should be thereafter instructed
by the plaintiff; that said trust agreement has, since the
date thereof, remained in full force and effect, and was
in full force and effect at the time of the institution of
this action. It is further set forth in the complaint that
after the execution of the instruments just referred to the
Title Company proceeded to subdivide said real property
into city lots, and had a map of the subdivision thereof
duly recorded; that in said subdivision and upon said map
there were two lots described as lots 188 and 189 of Tract
Number 2189, commonly known as Pellissier Square. The
complaint further alleges that on or about the 1st day
of February, 1923, and while said trust agreement referred
to was in full force and effect, the Title Company executed
a written contract for the sale of said lots 188 and 189 to
one Francis W. Henry, for the total purchase price of
$27,500. It is further alleged in the complaint that the
defendant Emma Summers was the real party in interest,
and that the contract executed in the name of Francis W.
Henry was for her uses and purposes. The complaint then
alleges that the defendants Summers and Henry, and each
of them, knew and had actual notice that the defendant
Title Guarantee & Trust Company held only the naked
legal title to said property; that it was held in trust for the
plaintiff; that the plaintiff was the real owner thereof,
and that her consent and approval were required before
the Title Company could make any conveyance or agree-

ment for the sale of said lots, or either of them. It is then alleged that the plaintiff never instructed the Title Company to make any sale of said property, or to execute or deliver the contract of sale therefor, and never consented to or approved the making of any such sale or such contract, and had no prior knowledge of the execution of said contract, and immediately upon learning thereof, informed the Title Company that she did not consent to or approve the same, and forthwith caused defendants Summers and Henry, to be advised of such fact, and demanded a return and cancellation of the contract. The prayer of the complaint is for a decree declaring said contract void; that it be delivered up and canceled; that the defendants Summers and Henry be held as involuntary trustees for the benefit of the plaintiff, if any rights they have under said contract. A copy of the contract referred to is attached to the complaint, marked exhibit 'A,' bearing date of February 1, 1923, purporting to have been executed between the Title Guarantee & Trust Company and Francis W. Henry, whereby the Title Company agrees to convey to Francis W. Henry lots 188 and 189 of Tract Number 2189, known as Pellissier Square, for the sum of $27,500, payable in instalments, the first instalment being the sum of $2,500, to be paid on the execution of the contract; the other instalments to be paid at stated times and in the amount set forth in the contract. A number of restrictions are set forth in the contract, not necessary to be particularly referred to herein. The contract is signed by the Title Guarantee & Trust Company, by A. F. Morlan, vice-president, and A. R. Kilgore, secretary, and by Francis W. Henry; approved by W. H. Taggert, assistant trust officer. The answer of the defendants Summers and Henry denies each and every of the allegations' of the plaintiff's complaint. The defendant Paul M. Reidy was brought in by an amendment to the complaint, but whatever interest the defendant Reidy acquired was acquired from the defendant Francis W. Henry, after the beginning of this action or after the controversy relating to the contract referred to, had arisen, and is subject to and dependent upon any rights, if any, which the defendant Francis W. Henry may have in and to said lots and need not be further mentioned herein. The Title Company, by its answer, admitted practically

all of the allegations of the complaint, but set forth in its answer that the contract referred to was never delivered by it to either the defendant Summers or the defendant Henry, although its possession was obtained by said defendants, who declined and refused to return the same to the Title Guarantee & Trust Company when demand was made therefor.

"While the plaintiff's complaint does not allege the nondelivery of the contract by the Title Company to the defendant Francis W. Henry, or to his agent Emma Summers, the cause was tried as though delivery was one of the issues tendered for determination by the court. As a considerable portion of the testimony is directed to the question of delivery, and the argument of counsel is directed to the same subject, we conclude that the trial was had upon the theory that the issue of delivery was tendered to the court even though not specifically set forth in the pleadings, and the decision of this cause must be had in view of the theory entertained at the trial of the action.

"The findings of fact, after referring to many items which are not disputed, find in paragraph number five: That the contract between the Title Company and the defendant Francis W. Henry was executed in duplicate, the material part of which is in these words: 'The said contract was prepared in duplicate, and one copy of it was afterwards taken away from the office of said Title Guarantee & Trust Company, without the knowledge or consent of said Company or of plaintiff, and thereafter, without the knowledge or consent of said Company, or this plaintiff, was signed and acknowledged in due form by Francis W. Henry before said Anna C. Durkee, as notary public, and the certificate of acknowledgment was signed by her under the date of March 15, 1923, and not otherwise. Said contract was never delivered to said Henry, or to any person for her, or at all. Said Emma A. Summers obtained possession of the said copy of said contract so acknowledged by said Henry, before said acknowledgment was made, and would not return it to said Title Guarantee & Trust Company, although due demand therefor was made on her.' And then further found in paragraph number seven: 'That the said defendants Summers and Henry, and each of them, knew and had actual notice that the defendant Title Guar-

antee & Trust Company, held only the naked legal title to said property in trust for this plaintiff, and that this plaintiff was the real owner of the property, and that her consent and approval was required before said defendant Title Guarantee & Trust Company could make any conveyance or agreement for the sale of said lots, or either of them.' It may be here stated that the finding of the court that the contract was 'signed' by Francis W. Henry before Anna C. Durkee as notary public, has no support whatever in the testimony. There is no controversy whatever that both copies of the contract were signed by the defendant Francis W. Henry at the residence of the defendant Emma Summers, prior to the signing thereof by Morlan and Kilgore acting for the company. The finding as to acknowledging and recording is likewise unquestioned. The decree went in favor of the plaintiff, and from this decree the defendants Summers and Henry appeal.

''Finding number eight is to the effect that the plaintiff never instructed the Title Company to make any sale of the lots in question, or to execute or deliver any contract of sale therefor; that she never consented to or approved of the contract, and does not now consent thereto or approve the same; that immediately upon learning of the contract, she informed the Title Company of her disapproval, and had demand made upon the defendants Summers and Henry for the return of the contract, etc.; and, further, that the plaintiff never received any of the purchase price for said lots.

''The first point made by the appellants is that findings numbers seven and eight are not supported by the evidence, in that there is no evidence to show that the appellants knew and had actual knowledge that said Title Company held only the naked legal title in trust for plaintiff, or that appellants knew that plaintiff's consent and approval was required before the Title Company could make any conveyance or agreement of sale, or that plaintiff never instructed the Title Company to make any sale of the property, or execute or deliver said contract of sale, or that plaintiff had no prior knowledge of such contract, or that immediately upon learning thereof, informed the Title Company that she did not approve.

"Point two is based upon the denial of the appellants' motion for nonsuit.

"Point three is based upon the fact that the evidence shows there was a previous action upon identical issues, wherein the same parties were adverse in interest, the Title Company suing in a representative capacity for Mrs. Pellissier.

"Point four made by the appellants is to the effect that by the terms of the trust agreement Mrs. Pellissier is estopped from suing the defendants Summers and Henry.

"Point five: That plaintiff is bound by the acts of her agent.

"Point six relates to the manner in which Mrs. Summers obtained possession of the contract.

"The seventh ground for reversal set forth by the appellants is urged upon the theory that the plaintiff has no cause of action and no standing in court.

"Before considering the seven assignments of why a reversal should be had, we will state that the admitted or uncontroverted facts set forth in the record are: execution, delivery and recordation of a deed, absolute in form, by which the plaintiff purported to convey to the Title Company the premises involved in this action, the same being included in the larger tract mentioned in the conveyance; that the trust agreement executed between said parties at the same time was not placed upon record, nor were its terms and conditions ever made known to the appellants; that for a period of some years James J. Donahue had been the real estate broker or sales agent negotiating and making sales of lots in Pellissier Square; that while acting as such broker or sales agent, the appellant Summers interviewed him relative to the purchase of the two lots in controversy; that following the negotiations between Summers and Donahue, Summers made an offer for the property of $27,500; that in pursuance of this offer, Donahue executed a preliminary agreement for the sale of the lots and asked of and received from the appellants the sum of $500 which was to be applied as a part of the first payment to be specified in the contract of purchase; that the negotiations between Summers and Donahue resulted in an understanding between them as to the terms of payment to be set forth in the contract, and also as to other

conditions to be inserted in the contract, not necessary here to mention; that following these negotiations a contract was drawn up in duplicate by the trust officer of the Title Company; that after the contract was so executed in duplicate it was delivered to Donahue, who took the same to the residence of Mrs. Summers, and there the duplicate copies of the contract were signed by the appellant Francis W. Henry, and then handed back to Mr. Donahue, who returned the contracts to the Title Company, and in a day or two thereafter Mrs. Summers went to the office of the Title Company, having with her a cashier's check for the sum of $2,000; that Mr. Taggert, the trust officer of the company, produced the duplicate copies of the contract which had not then been signed or executed on the part of the company; that Mr. Taggert took the duplicate copies of the contract, went into the appropriate offices of the company, where the name of the Title Company was affixed by and together with the names of the vice-president, A. F. Morlan, and the secretary, A. R. Kilgore, and the seal of the company affixed, following which Mr. Taggert returned to the presence of Mrs. Summers with the duplicate contract in his possession. The subsequent history of the contract is controverted.

"The trust agreement, among other provisions, contained the following paragraphs numbered third, fifth and seventh, to which our attention has been specifically directed: 'Third: When said map has been duly accepted and recorded as required by law, the party of the second part shall issue contracts of sale and convey lots in such subdivision to such person or persons, at such prices, and upon such terms as it shall be hereafter instructed by the said party of the first part, her heirs or assigns.' 'Fifth: The party of the second part shall impose such restrictions, covenants and conditions in all agreements and deeds executed by it as it shall be in writing requested to do by said party of the first part, her heirs or assigns.' 'Seventh: Any conveyance made by the Title Guarantee and Trust Company to the purchasers of lots shall vest in such purchasers an absolute and unassailable title, and there shall be no obligation on the part of the purchasers to see to the application of the purchase money, it being expressly understood by all parties hereto that any conveyance made

by the party of the second part shall be binding upon all parties hereto, and should the party of the second part violate any of the provisions hereof, then the beneficiary shall have recourse only against said party of the second part.'

"While many reasons have been assigned by appellants for reversal, the determination of this cause really depends upon whether material findings are supported by the testimony. It may be here stated that finding five, to the effect that the contract was never delivered, is not assailed as being contrary to the evidence, the argument of appellants being that after the signature of the Title Company was properly attached, the delivery of the contract by the trust officer Taggert was immaterial.

"Did the appellants know that the Title Company held only the legal title, and that the approval of Mrs. Pellissier was necessary to consummate the deal, or have knowledge of circumstances sufficient to put them upon inquiry? The deed and trust agreement herein referred to covering Pellissier Square were executed in the year 1913. The negotiations relative to lots 188 and 189 involved in this action practically all took place during the latter portion of January and the month of February, 1923. The record shows that in the year 1920, seven years after the execution of the deed of conveyance by the plaintiff to the Title Company, and three years preceding the negotiations involved in this action, Mrs. Summers had and carried on negotiations with Mr. Donahue, and, also, personally, with Mrs. Pellissier, relative to the purchase of a certain other lot included in Pellissier Square, fronting on that certain street known as Western avenue. It appears from the testimony that this lot was priced by Mrs. Pellissier at $3,700, and that Mrs. Summers offered to Mr. Donahue for said lot the sum of $3,500; that Mrs. Pellissier declined to accept Mrs. Summers' offer, and Mrs. Summers finally agreed to buy the lot at the figure named by Mrs. Pellissier. The testimony of Mr. Donahue is as follows: 'At that time (1920) I had some lots south on Wilshire Boulevard on the east side of Western Avenue, at $3700.00. She (meaning Mrs. Summers) asked me if I could deliver one of them for $3500.00. I told her no, I didn't think I could deliver it because of our price of $3700.00. Mrs. Pellissier as a

rule never cut her prices. She was very firm about prices she had given on properties. She (referring to Mrs. Summers) said, ''Isn't there any way for you to go to her, or for me to go to her?'' I said, ''I don't see why it would be necessary, Mrs. Summers.'' But after persuading me to go down, I had Mrs. Summers go in and meet Mrs. Pellissier at her residence at the corner of Serrano and Seventh Street, Los Angeles, and she spoke to Mrs. Pellissier, and Mrs. Pellissier turned her down on the $3500.00 offer.' The testimony in the record shows that a contract for the sale of the lot just referred to facing on Western avenue was executed in favor of Mrs. Summers, but our attention has not been called to, and we have not discovered in the transcript, by whom the contract of sale was executed, unless it is covered by general testimony set out in the record, that all contracts for the sale of lots in Pellissier Square were executed by the Title Company.

''In relation to the negotiations covering the lots in controversy, the witness Donahue testified in substance that during the month of January, 1923, Mrs. Summers came to him and offered $22,500 for the two lots. The exact words of the witness' testimony in this particular are: 'I refer now back to when she made the offer of $22,500.00, and I told her that Mrs. Pellissier would not take it, I was positive of that.' The witness further stated that at that time he took the $25,000 offer from Mrs. Summers to Mrs. Pellissier, and it was refused; that the first offer was made on or about the 2d or 3d of January, 1923. In relation to the different offers, the witness Donahue further testified: 'I told Mrs. Summers the $25,000.00 offer was refused by Mrs. Pellissier, and again she made another offer of $27,500.00, with the terms about the same that were in the former contract. When I speak of the former contract I mean the contract for $25,000.00. At this time I drew another contract, on the evening of February 3rd, at her home—(meaning Mrs. Summers' home)—for $27,500.00. At that time Mrs. Summers said she wanted to have the deal completed as fast as possible. I told her I would. Within the next two or three days I went to the Title Company. I did not get hold of Mrs. Pellissier, and I ordered the Title Company to bring down a contract showing it in Francis Henry. I drew the contract for

$27,500.00, and Mrs. Summers at the time put up $500.00 in currency. This was in the reception-hall at the home of Mrs. Pellissier. Mrs. Summers took the contracts, went out in the reception-hall and had the contract signed by Francis W. Henry.' The testimony of the trust officer Taggert, tending to bring home to the knowledge of Mrs. Summers the interest of Mrs. Pellissier in the lots is as follows: 'When Mrs. Summers came in I passed the copy of the contract to her to read. She objected to certain things in the contract and asked for certain modifications or amendments. I said, ''I can't grant this. I will have to call Mrs. Pellissier up and see whether or not she will permit it.'' I stepped to the telephone and called Mrs. Pellissier's phone and Mrs. de Rulet answered the phone. I explained to her what Mrs. Summers wanted, and she said she couldn't answer the question for me, that she would have to see her mother, so I came back from the phone and told Mrs. Summers that I couldn't give her an answer, and that if she would come in tomorrow, I would perhaps get in touch with Mrs. Pellissier, or words to that effect, I gave her a receipt, however, for her check for $2000.00, before she left. I think, at the time she gave me the cashier's check, I gave her the receipt, because I wasn't ready yet to deliver the contract, and the receipt for the money would be sufficient until I delivered the contract.' The testimony of Mrs. Summers, called as a witness for the plaintiff, and examined under the provisions of section 2055, Code of Civil Procedure, was to the effect that three years previous to the negotiations involved in this action she went with Mr. Donahue to the residence of Mrs. Pellissier to see her about a lot in Pellissier Square situate on Western avenue; that Mr. Donahue said: 'We would have to go and see her about the piece of property.' The testimony of Mrs. Summers as to the negotiations had in 1923, covering the two lots, was substantially the same as that given by Mr. Donahue, save and except that where the witness Donahue used the name 'Mrs. Pellissier,' Mrs. Summers testified that Donahue used the name 'owner.' Appellants, not having raised the question that the testimony was insufficient to support the finding of nondelivery of the contract, it is unnecessary to set forth any of the testimony further than to say there

is sufficient testimony to show that the contract came into the possession of Mrs. Summers without any manual tradition from the Title Company. In other words, that when the contract was handed to Mrs. Summers to look over or examine, she proceeded to take the contract away with her. As we read her testimony, this is not denied by Mrs. Summers, the contention of appellants being that delivery was nonessential.

"The record shows that at a date previous to the negotiations between Summers and Donahue, relative to lots 188 and 189, the plaintiff had substantially stated that she would sell the two lots for $27,500, but we find no testimony in the record that the plaintiff ever authorized the particular sale or execution of the particular contract now before the court. Whether the facts presented in the record were sufficient to justify the trial court in drawing the inference that such authorization had been given, rather than the finding that such authorization had not been given, was a matter exclusively for the trial court, as in all these matters there was considerable conflicting testimony, and nothing has been presented to us justifying the conclusion that the assailed findings have no support in the evidence.

"The motion for nonsuit is so bound up with the other assignments of error as not to require separate consideration. ■ The third assignment of error and the reason why a reversal should be had is based upon the fact that there was a previous action begun and prosecuted by the Title Company against the appellants involving the validity of the contract now under consideration; that in such prior action the appellants had judgment against the Title Company.

"While the record in the former action was introduced in testimony at the trial of this cause, a reference to the answer of the appellants shows that the pendency of said action was not pleaded in abatement of the present action, and that no effort was made to have the trial of this action continued until the final determination of the action between the Title Company and the appellants. The record in the case of the Title Company against the appellants showed that an appeal had been taken from the judgment of the trial court in that action, and that under the provisions of section 1049 of the Code of Civil Procedure it was still pend-

ing and undetermined at the time of the trial of the present action, and did not constitute a bar. Until a judgment has become final, it cannot be pleaded as a bar to a subsequent action, but if the party in whose favor the prior judgment has been rendered, so elects, he may in a subsequent action plead a prior action in abatement and lay the foundation for securing a continuance of the trial of the second action until the final determination of the first. (*Brown* v. *Campbell,* 100 Cal. 635 [38 Am. St. Rep. 314, 35 Pac. 433]; *Harris* v. *Barnhart,* 97 Cal. 546 [32 Pac. 589]; *Leonard* v. *Flynn,* 89 Cal. 335 [23 Am. St. Rep. 500, 26 Pac. 1097]; *Estate of Ricks,* 160 Cal. 467 [117 Pac. 539]; *Howard* v. *Howard,* 67 Cal. App. 56 [226 Pac. 984].) By reason of the failure of the appellants to properly plead the judgment in the former action by way of abatement, it is unnecessary for us to consider the cases cited to the effect that an action prosecuted by a trustee in which the trustor does not join is binding upon the trustor. The cases cited by the appellants state the law accurately as to the facts presented, but are not applicable here.

 "We cannot agree with appellant's contention that delivery of the contract was not essential to its binding force and effect. The law applicable to delivery and the necessity therefor is very clearly stated in 9 California Jurisprudence, page 149, section ·48, and is peculiarly applicable here: 'There is no better established legal principle than that the transfer of the ownership of real estate, so far as the transfer is to be made by deed, necessitates a delivery of that deed to effectuate the passing of title from the grantor to the grantee. Delivery is the force that vitalizes the instrument without which, though signed and acknowledged, it is invalid, and not effective for any purpose. If delivery is wanting, the deed is void *ab initio,* and it is no better than a blank form. Consequently it is recognized that prior to its actual delivery the grantor named in the instrument may change the character of the delivery originally contemplated, and has the right to destroy and nullify the instrument ·itself. And this operative characteristic of delivery is not peculiar to deeds, but attaches to all written contracts.'

 "Whether the appellants had actual written notice ·is not necessary to support the finding of notice. If the

circumstances are such as to put a prudent person upon inquiry, that is all that is required. (See 25 Cal. Jur., p. 837, sec. 283, where the rule is fully stated.) It is argued, however, that under the terms of a trust agreement the only remedy on the part of the plaintiff is by an action against the Trust Company. This would be true if the other factors set forth in this opinion had not entered into this cause. The dealing of Mrs. Summers with plaintiff in 1920, after the execution of the conveyance to the Title Company, unquestionably gave her knowledge of the beneficial interest and ownership of plaintiff in the property involved. This, coupled with the fact that the finding that the contract was never delivered, necessitates an affirmance of the judgment, and it is so ordered.''

The judgment is affirmed.

Shenk, J., Waste, C. J., Curtis, J., Langdon, J., Seawell, J., and Richards, J., concurred.