[No. A118124. First Dist., Div. Four. Nov. 20, 2008.]

STATE BAR OF CALIFORNIA, Plaintiff and Appellant, v.
WILLIAM J. STATILE, Defendant and Respondent.

## COUNSEL

David Julian Cook and Nathaniel L. Dunn for Plaintiff and Appellant.

Bradley Allen Bartlett for Defendant and Respondent.

## OPINION

**SEPULVEDA, J.**—Respondent William J. Statile, a former attorney, settled lawsuits brought by parties alleging that he had misappropriated trust funds. The settling plaintiffs reserved their right to seek additional reimbursement from the Client Security Fund (CSF), administered by appellant State Bar of California (State Bar or the bar). Those same settling plaintiffs (as well as a trustee of a separate trust alleging wrongdoing by Statile) applied for reimbursement from the CSF, which reimbursed them for losses allegedly caused by Statile. The State Bar brought this action for reimbursement pursuant to its rights of subrogation under Business and Professions Code section 6140.5 (section 6140.5). On appeal, the bar challenges the trial court's conclusion, following a court trial, that the bar's right of recovery was limited to money due under the agreement settling lawsuits against Statile. We reverse the judgment.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Statile Settles Lawsuits Alleging Misappropriation of Trust Funds.*

Statile was an attorney licensed to practice law in the state. In that capacity, he represented the trustees of various trusts. A trust known as the Barbettini Revocable Trust and its successor trustee, Bette Nicholas, filed three lawsuits against respondent in San Diego Superior Court: *In re Barbettini* (Super. Ct. San Diego County, 2000, No. PN24805) (the probate case) and *Nicholas v. Statile* (Super. Ct. San Diego County, 2000, No. GIN012457) and *Nicholas v. Statile* (Super. Ct. San Diego County, 2001, No. GIN012797) (collectively, the Barbettini cases). The lawsuits alleged that Statile, in his capacity as trustee of the trust, misappropriated trust funds and kept them for his own benefit. Respondent Statile, the Barbettini Revocable Trust, and Nicholas entered into a settlement agreement to resolve the Barbettini cases on August 8, 2002 (settlement agreement).

The settlement agreement called for Statile, among other things, to pay $20,000 to the Barbettini Revocable Trust by August 10, 2002, and to pay an additional $80,000 (plus interest) in periodic installments, with the final payment due on January 2, 2008.[1] In the event of any default in payment, the settlement agreement called for a stipulated judgment to be entered against Statile in the amount of $300,000 (minus previous payments). It was undisputed at the time of trial in this case (in Feb. 2007) that Statile had timely made all payments required under the settlement agreement as they had come due.

The settlement agreement also required Statile to submit his resignation to the State Bar with charges pending, which he did on September 26, 2002. The Supreme Court accepted Statile's resignation on August 13, 2003.

Finally, the settlement agreement provided that Statile not object to any notice of intention to pay sent by the CSF for any claims made by "the trustees and/or beneficiaries" (presumably of the Barbettini Revocable Trust) for reimbursement from the fund. Statile agreed to cooperate in "obtaining or providing any additional documentary evidence required by the Client Security Fund in connection with claims made by Mrs. Nicholas." The agreement

---

[1] The State Bar claims, without citation to the record (cf. Cal. Rules of Court, rule 8.204(a)(1)(C)), that the settlement agreement had the effect of "[r]educing [Statile's] liability significantly," that the amount he was to pay represented "pennies on the dollar," and that Statile negotiated "a terrific deal." Although it is certainly true that the settling plaintiffs later claimed that they had suffered losses far greater than what they settled for, we note that Statile has never admitted wrongdoing.

further provided that Statile's failure to object to any notice to pay "not constitute an admission of the truth of anything alleged in the [Barbettini] cases or in the application to the Client Security Fund." Each party was to execute a mutual general release of claims, except that Statile's release would "contain no provision precluding the trustee from claiming and receiving the maximum allowable reimbursement from [the] Client Security Fund."

### B. *CSF Applications.*

Four trusts that were continuations of, or created out of, the Barbettini Revocable Trust that was the subject of the settlement agreement (collectively, the Barbettini trusts) filed applications for reimbursement with the CSF in March and May 2003. All four applications sought reimbursement for Statile's alleged misappropriation of trust funds and assets before execution of the settlement agreement. The Barbettini Family Trust submitted an application requesting $38,308.99. The Barbettini Marital Trust submitted an application requesting $50,000. The marital trust claimed that its total losses amounted to $298,232.27; however, the maximum allowable payment to a CSF applicant is $50,000. (Rules of State Bar, tit. 3, Client Security Fund Matters, rule 4(c) (CSF rules).) The Barbettini Q-Tip Trust submitted an application requesting $50,000. The Q-Tip trust claimed that its total losses amounted to $89,149.67. Finally, the Barbettini By-Pass Trust submitted an application requesting $32,782.69.[2]

Statile received notice that the State Bar was processing at least three of the four applications. A State Bar paralegal notified Statile on May 27, 2003, that Nicholas had filed applications against Statile on behalf of the Barbettini Family Trust, the Barbettini Marital Trust, and the Barbettini Q-Tip Trust. (The Barbettini By-Pass Trust submitted its application after the bar sent its letter to Statile.) The bar's letter stated, "If reimbursement is made from the Fund, the State Bar is assigned all rights the Applicant may have against you." Statile's attorney wrote to the State Bar paralegal indicating that Statile had settled the claims of "the Barbettini Trust" and was precluded under the parties' settlement agreement from objecting to the applications. The State Bar and the CSF received a copy of the settlement agreement before issuing notices of intent to pay on the applications. The CSF never requested additional documents from Statile, did not subpoena him to testify, and did not hold a hearing.

---

[2] We note that the applications apparently were less than forthcoming about the then current status of legal proceedings against Statile. For example, at the time the applications were submitted, Statile was to have already paid $27,500 under the settlement agreement. The marital trust's application acknowledged such payments; however, the applications on behalf of the other three trusts did not. The application on behalf of the bypass trust acknowledged that the probate case had been filed against Statile, but did not describe the current status of the proceedings or indicate that there was a settlement of any claims.

In November 2003, the CSF served notices of intention to pay informing Statile that the fund planned to pay the entire amount requested in all four applications. The notices set forth the factual allegations against Statile and concluded that, if uncontroverted, they established a reimbursable loss under CSF rules. Consistent with the terms of the settlement agreement, Statile did not file any written objection to the notices.

In January 2004, the CSF paid a total of $171,091.68 to the four trusts that had filed applications, the entire amount requested. The parties to this appeal stipulated in the trial court that at the time the CSF made payments to the four Barbettini trusts, Statile's only obligations to those trusts were defined by the terms of the settlement agreement, a copy of which the bar received before paying the applicants.

In July 2004, Nicholas submitted two applications to the CSF in her capacity as beneficiary of two of the Barbettini trusts: one sought reimbursement for $13,702.38 in connection with Statile's alleged wrongdoing with respect to the Barbettini Q-Tip Trust; the other sought reimbursement for $50,000 in connection with Statile's alleged wrongdoing with respect to the Barbettini Marital Trust. Like the applications on behalf of the Barbettini trusts, Nicholas's applications sought compensation for Statile's alleged misappropriation of trust funds that occurred before the execution of the settlement agreement.

On August 4, 2005, the CSF Commission issued a tentative decision granting Nicholas payment of $50,000 as a beneficiary of the Barbettini Marital Trust, but denying her payment as a beneficiary of the Barbettini Q-Tip Trust. The CSF Commission concluded that Nicholas had established a reimbursable loss within the meaning of CSF rules. The tentative decision acknowledged that (1) Statile and Nicholas had entered into a settlement agreement that called for Statile to pay $100,000 in installments, (2) Statile had already repaid $57,500, and (3) the CSF had already reimbursed the Barbettini trusts a total of $171,091.68. The commission concluded that Nicholas had established a total loss of $298,232.27. It then subtracted the $57,500 that Statile had already paid (as opposed to the total amount due under the settlement agreement) and the $50,000 that the CSF had already reimbursed to the marital trust, which left a balance of $190,732.27. As a beneficiary of 35 percent of the marital trust, Nicholas therefore had a balance owing of $66,756.29 (35 percent of $190,732.27). Because the maximum reimbursement allowed from the CSF is $50,000, the commission concluded that Nicholas was entitled to reimbursement in that amount. After receiving no objection from Statile, Nicholas was paid on September 13, 2005. As with the payments made to the Barbettini trusts, the parties

stipulated before trial in this case that at the time the CSF paid Nicholas, Statile's only obligations to her were defined by the terms of the settlement agreement.

Although Statile could have challenged the CSF's decisions to reimburse the various applicants by seeking a writ of mandate in superior court pursuant to Code of Civil Procedure section 1094.5 (CSF rule 17), he did not do so.

### C. *Proceedings Below.*

On April 11, 2005, appellant State Bar commenced this action when it filed a complaint (No. 440262) against respondent Statile seeking $32,782.69, the amount the CSF paid to the Barbettini By-Pass Trust. The complaint alleged causes of action for "embezzlement and breach of fiduciary duty" and "theft of client property." The complaint alleged that Statile embezzled money from "APPLICANTS" (a term that was undefined in the complaint) and had failed to return money to them. Statile filed a cross-complaint for declaratory relief, seeking a declaration that his obligation to the bar (if any) was limited to his obligations set forth in the settlement agreement.

On March 1, 2006, the bar filed a second complaint (No. 449910) against Statile seeking $229,338.63 (plus interest). This amount represented the money that the CSF paid to (1) Nicholas as beneficiary of the Barbettini Marital Trust ($50,000), (2) the Barbettini Family Trust ($38,308.99), (3) the Barbettini Marital Trust ($50,000), (4) the Barbettini By-Pass Trust ($32,782.69),[3] and (5) the Barbettini Q-Tip Trust ($50,000). The complaint also sought $8,246.95, which the CSF had paid to Gloria Trumble to reimburse her in connection with Statile's alleged mishandling of assets of a trust known as the Edward J. Schneider Trust (the Trumble claim). According to a CSF notice of intention to pay admitted at trial, an order filed in San Diego Superior Court surcharged Statile that amount. The Trumble claim was apparently unrelated to the Barbettini cases. It was not covered by the settlement agreement, and Trumble was represented by an attorney different from the one who filed applications on behalf of the various Barbettini trusts.

Complaint No. 449910 alleged causes of action for "embezzlement and breach of fiduciary duty" and "theft of client property." Statile filed a cross-complaint for declaratory relief, again seeking a declaration that his obligation to the bar, if any, was limited to his obligations set forth in the settlement agreement.

The State Bar's two complaints were consolidated. Statile filed an inter-pleader action in San Diego Superior Court, requesting a declaration on the

---

[3] It is unclear why the second complaint sought reimbursement for money paid to the By-Pass Trust, which was also the subject of the bar's first complaint.

respective rights of Nicholas and the bar to the remaining payments due under the settlement agreement. Pursuant to an agreement with Nicholas, Statile deposited payments under the settlement agreement with the San Diego court as they became due.

A court trial in this action was held on February 16, 2007. Two witnesses testified. Respondent Statile was questioned about his handling of the Barbettini trusts and about the settlement agreement. When asked whether he properly accounted for funds in the Barbettini trusts, Statile testified, "Due to an interoffice embezzlement by an employee, Linda Cortez, I did not and could not [properly account for funds], no."[4] With respect to Gloria Trumble, Statile testified that Trumble was not a client of his; he believed she was an attorney and that he was in a court-ordered mediation with her.

Statile also testified at trial that he never suggested to the settling plaintiffs that they should seek the remainder of the amount he owed them from the CSF. He testified that he was "[s]omewhat" aware of what the CSF was when he entered into the settlement agreement, but that he was "[n]ot at all" aware that the fund was designed to ameliorate losses sustained at the hands of attorneys.

Matthew Zawol, senior counsel to the CSF, testified about the general procedures for processing claims to the CSF. With respect to the applications that are the subject of this appeal, Zawol testified that they were processed in the normal course of business. He acknowledged on cross-examination that he had no personal knowledge of the facts underlying the various CSF applications.

The trial court admitted into evidence the CSF applications filed by the four Barbettini trusts, the application of Nicholas as beneficiary of the Barbettini Marital Trust, and the application of Gloria Trumble on behalf of the Edward J. Schneider Trust. They were admitted into evidence not to prove the truth of any assertion set forth in the applications. The trial court admitted (for all purposes) the CSF's notices of intent to pay the claims of the four Barbettini trusts and the claim of Gloria Trumble on behalf of the Edward J. Schneider Trust. It also admitted the CSF Commission's final decision that the bar would pay Nicholas $50,000 as beneficiary of the Barbettini Marital

---

[4] We agree with Statile that, contrary to the bar's assertion, he has never admitted any wrongdoing. The bar argues in its reply brief that Statile's failure to respond to the CSF's notices of intent to pay the applicants was an "admission and concession." To the contrary, the settlement agreement provided that failure to object to any notice to pay "shall not constitute an admission of the truth of anything alleged in the [Barbettini] cases or in the application to the Client Security Fund."

Trust "as proof that the Client Security Fund Commission made the decision that is stated therein on the first page," but not for the truth of matters asserted therein.

The trial court issued a tentative statement of decision on March 19, 2007. The court concluded that upon making payment to the various applicants, the State Bar became subrogated to the rights of the applicants against Statile, as they existed on the date of payment, and that those rights "were defined by and limited to the terms of the" settlement agreement. Because the "State Bar's rights against Statile are no greater than, and are coextensive with, the Applicants' rights against Statile under the Settlement Agreement," the bar had the right to the two remaining payments under the agreement. The court also concluded that, consistent with the settlement agreement, the State Bar was entitled to an entry of judgment in the amount of $300,000 (less credit for previous payments) in the event that Statile defaulted.[5]

The trial court issued its final statement of decision on April 6, 2007. Although the trial court corrected three typographical errors contained in the proposed statement, it did not change its conclusion that the State Bar was entitled only to Statile's remaining payments under the settlement agreement. Like the tentative statement of decision, the final statement of decision did not address the Trumble claim. The bar timely appealed from the subsequent judgment.

## II.

### DISCUSSION

A. *The Client Security Fund.*

■ The Legislature enacted section 6140.5 in 1971, authorizing the creation of the CSF.[6] (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 555 [216

---

[5] Because of the conflicting claims to the remaining payments, Statile was permitted to make future payments under the settlement agreement by timely depositing them in the interpleader action in San Diego. The trial court's final statement of decision also provided that the bar's rights to receive payments and stipulated judgment "are subject to modification by final judgment" in the interpleader action.

[6] Section 6140.5 provides: "(a) The board shall establish and administer a Client Security Fund to relieve or mitigate pecuniary losses caused by the dishonest conduct of active members of the State Bar . . . arising from or connected with the practice of law. Any payments from the fund shall be discretionary and shall be subject to regulation and conditions as the board shall prescribe. . . . [¶] (b) Upon making a payment to a person who has applied to the fund for payment to relieve or mitigate pecuniary losses caused by the dishonest conduct of an active member of the State Bar, the State Bar is subrogated, to the extent of that payment, to the rights of the applicant against any person or persons who, or entity that, caused the

Cal.Rptr. 367, 702 P.2d 525].) The purpose of the fund is to compensate victims who have incurred monetary loss as the result of their attorneys' misconduct. (§ 6140.5, subd. (a).) Pursuant to the CSF rules, an applicant may fill out a preprinted form to describe the circumstances surrounding a loss, under penalty of perjury. (CSF rule 13.) In order to qualify for reimbursement from the CSF, an applicant must establish the loss of money or property which came into the hands of an active member of the bar by dishonest conduct while the member was acting as a lawyer, trustee, or fiduciary. (CSF rule 2.) " '[D]ishonest conduct' " includes, among other things, "[w]rongful acts committed by a lawyer in the nature of theft or embezzlement of money or the wrongful taking or conversion of money or property." (CSF rule 6(a).) ■ Before the CSF Commission directs payment from the fund, it must find that a reimbursable loss has been established by a preponderance of the evidence. (CSF rule 15(e).) After an application is screened, the CSF Commission tentatively decides what action should be taken, and its tentative decision is served on the applicant and the lawyer whose actions led to the applicant's loss. (CSF rule 14(c).) The parties then have 30 days to file any written objections to the proposed recommendations and request a hearing, if desired. (CSF rule 14(c).) The CSF then takes final action on the application, which may include directing reimbursement from the fund. (CSF rule 15(a), (b).) An attorney or an applicant may seek review in superior court of the final decision of the CSF to grant or deny reimbursement pursuant to Code of Civil Procedure section 1094.5. (CSF rule 17.)

■ "All payments from the [CSF] shall be a matter of grace and not of right and shall be in the sole discretion of the State Bar of California. No client or member of the public shall have any right in the Fund as a creditor, third party beneficiary, or otherwise." (CSF rule 2.) Payment to an applicant is conditioned upon a "pro tanto assignment from the applicant of the applicant's rights against the lawyer involved and against any third party or

pecuniary loss. The State Bar may bring an action to enforce those rights within three years from the date of payment to the applicant. [¶] (c) Any attorney whose actions have caused the payment of funds to a claimant from the Client Security Fund shall reimburse the fund for all moneys paid out as a result of his or her conduct with interest, in addition to payment of the assessment for the procedural costs of processing the claim, as a condition of continued practice. The reimbursed amount, plus applicable interest and costs, shall be added to and become a part of the membership fee of a publicly reproved or suspended member for the next calendar year. For a member who resigns with disciplinary charges pending or a member who is suspended or disbarred, the reimbursed amount, plus applicable interest and costs, shall be paid as a condition of reinstatement of membership. [¶] (d) Any assessment against an attorney pursuant to subdivision (c) that is part of an order imposing a public reproval on a member or is part of an order imposing discipline or accepting a resignation with a disciplinary matter pending, may also be enforced as a money judgment. . . ." The statute was amended in 2005 (after payments were made to the Barbettini trusts and Nicholas); however, the changes were not significant and have no bearing on our analysis. (Stats. 2005, ch. 341, § 3.)

entity concerning the dishonestly caused loss for which the applicant is receiving reimbursement from [CSF]." (CSF rule 19.) The State Bar is statutorily subrogated to the extent of payment to the rights of a victim against the person or persons who caused the pecuniary loss. (§ 6140.5, subd. (b).)

### B. *The State Bar's Statutory Subrogation Rights.*

The parties disagree over what subrogation rights the bar acquired against Statile when the CSF paid the Barbettini trusts and Nicholas on their claims. Section 6140.5, subdivision (b) provides: "Upon making a payment to a person who has applied to the fund for payment to relieve or mitigate pecuniary losses caused by the dishonest conduct of an active member of the State Bar, the State Bar is subrogated, to the extent of that payment, to the rights of the applicant against any person or persons who, or entity that, caused the pecuniary loss. The State Bar may bring an action to enforce those rights within three years from the date of payment to the applicant."[7] The trial court concluded, and Statile argues on appeal, that because the settlement agreement limited the rights of the Barbettini trusts and Nicholas to recover from Statile, the State Bar's recovery pursuant to its subrogation rights likewise was limited by the settlement agreement. The State Bar argues that the settlement agreement did not so limit its subrogation rights. This is apparently an issue of first impression, as we have found no cases addressing a situation where parties settled a lawsuit but preserved the right of the plaintiff to seek reimbursement from the CSF. We begin by setting forth the general principles of subrogation.

■ "Subrogation, a legal fiction, is broadly defined as the substitution of one person in the place of another with reference to a lawful claim or right. It is a right which is purely derivative and it permits a party who has been required to satisfy a loss created by a third party's wrongful act to step into the shoes of the loser and pursue recovery from the responsible wrongdoer. Stated another way, it is a substitution of one person in place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to a debt or claim, and its rights, remedies, or securities." (73 Am.Jur.2d (2001) Subrogation, § 1, pp. 541–542, fns. omitted.) ■ " 'Statutory subrogation,' as its name suggests, arises by an act of the legislature that vests a right of subrogation with a party or

---

[7] Statile argues that the bar "had no jurisdiction over" him when it paid the various applicants because he was no longer a lawyer. To the extent that he argues that the bar was precluded from bringing this action against him, we reject his argument. Section 6140.5, subdivision (b) provides that the bar may bring an action to enforce an applicant's rights "against any person or persons who" caused an applicant pecuniary loss; the bar is not limited to seeking reimbursement from an active member of the State Bar.

category of parties, and it is governed by the terms of the statute under which it is claimed as a matter of statutory construction." (*Id.*, § 3, pp. 544–545, fns. omitted.) " 'The nature of subrogation and its prohibition against double recovery make it abundantly clear that subrogation involves succession to the rights of others. Rights under subrogation are derivative rights, and succession to another's rights, like water, cannot rise higher than its source.' " (*Board of Administration v. Glover* (1983) 34 Cal.3d 906, 915 [196 Cal.Rptr. 330, 671 P.2d 834], quoting *Ventura County Employees' Retirement Association v. Pope* (1978) 87 Cal.App.3d 938, 952 [151 Cal.Rptr. 695].) "[T]he 'true nature of subrogation' is that ' "it is applied in all cases in which 'one party pays a debt for which another is primarily answerable, and which, in equity and good conscience, should have been discharged by the latter.' " ' " (*Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 558 [60 Cal.Rptr.2d 591].) It is abundantly clear here that Statile was primarily answerable for any loss suffered by the applicants and, in equity and good conscience, should have been the one to discharge it. (*Ibid.*)

 Statile argues that because section 6140.5, subdivision (b) provides that the State Bar becomes subrogated to the rights of an applicant "[u]pon making a payment" to the applicant, the bar acquired the applicants' rights as they existed at the time of making the payment. We believe that Statile misconstrues the import of this language. The payment of a debt is a prerequisite to acquiring subrogation rights. (E.g., *Putnam v. Commissioner* (1956) 352 U.S. 82, 85 [1 L.Ed.2d 144, 77 S.Ct. 175] ["The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes."]; *Smith v. Parks Manor* (1987) 197 Cal.App.3d 872, 879 [243 Cal.Rptr. 256] [insurer becomes subrogated to insured's rights upon paying insured's claim].) In the context of payments from the CSF, at the time of payment to an applicant ("[u]pon making a payment"), the bar acquires a right of action against the wrongdoer, which the bar then has three years to pursue. (§ 6140.5, subd. (b).) The "[u]pon making a payment" language of section 6140.5, subdivision (b) merely reflects the general requirement that a payment of a debt is a prerequisite to the CSF's subrogation rights.

The question remains to which "rights of the applicant against [Statile]" (§ 6140.5, subd. (b)) the State Bar became subrogated when it paid the applicants. There is no dispute that, absent the settlement agreement, the State Bar would be entitled to subrogation up to "the extent of" its payment to the various applicants. (*Ibid.*) The parties stipulated below that at the time the CSF made payments to the Barbettini trusts and Nicholas (as beneficiary of the Barbettini Marital Trust), Statile's only obligation to the trusts was

defined by the terms of the settlement agreement. The trial court concluded that because the State Bar's rights against Statile were "no greater than, and [we]re coextensive with, the Applicants' rights against Statile under the Settlement Agreement," this meant that the bar was entitled only to Statile's remaining payments under the settlement agreement. In other words, the State Bar was subrogated only to the rights that the applicants had against Statile as set forth in the settlement agreement. However, the settlement agreement itself specifically provided that Nicholas and the Barbettini Trust were permitted to seek full reimbursement for their losses from the CSF.[8] The agreement also provided that Statile would not object to any notice of intent to pay issued by the CSF.[9] These provisions necessarily contemplated that the CSF would be permitted to seek reimbursement from Statile. Had the settlement agreement truly barred the CSF from seeking full reimbursement from Statile, above what he was obligated to pay under the settlement agreement, it would have been unnecessary for Statile to waive his right to object to any notice of intent, as he would have had no interest in the proceedings before the CSF. Moreover, we construe Statile's agreement not to object to the settling plaintiffs seeking payment from the CSF as a waiver of his present claim that the bar is precluded from enforcing its subrogation rights above what is owed under the settlement agreement. The statutory scheme contemplates that the CSF may seek reimbursement from a former attorney who caused a client monetary loss through its right of subrogation. (§ 6140.5, subd. (b).) By permitting the settling plaintiffs to seek reimbursement from the CSF, Statile implicitly acknowledged that the CSF would be permitted to seek reimbursement from him.

 Undoubtedly due to the paucity of directly applicable and controlling case law, the parties argue subrogation law from other arenas, by analogy. Thus, Statile argues generally that "an assignee has no greater rights against an obligor than did the original assignor." Although the bar is not an insurer, this general proposition is consistent with the rule in the insurance context that " 'an insurer in its role as subrogee has no greater rights than those possessed by its insured, and its claims are subject to the same defenses.' " (*Commercial Union Assurance Co. v. City of San Jose* (1982) 127 Cal.App.3d 730, 736 [179 Cal.Rptr. 814].) Statile in effect argues that he may use the

---

[8] The settlement agreement provided that although the parties were to execute a mutual general release of claims, Statile's release would "contain no provision precluding the trustee from claiming and receiving the maximum allowable reimbursement from [the] Client Security Fund."

[9] The CSF's Zawol testified that had Statile objected to the notices to pay, the CSF would not have automatically paid the applicants. Instead, "a different processing" would have been "trigger[ed]," with the applications being sent to the CSF Commission. Although payments from the CSF "shall be a matter of grace and not of right and shall be in the sole discretion of the State Bar of California" (CSF rule 2), Statile's nonobjection to payment nonetheless made it easier for the applicants to obtain reimbursement from the CSF.

settlement agreement as a defense to an action brought by the bar in the same way he could use it in an action brought by the settling plaintiffs. Were the Barbettini Trust or Nicholas (or both) to pursue an action against Statile even though he had timely made all payments due under the settlement agreement, he no doubt would rely on the settlement agreement as a defense to any recovery beyond the amount he owed under the agreement. Statile has no such defense against the bar, however, because he specifically waived his right to object to the bar's payment of money to the applicants. He therefore likewise waived any objection to the bar seeking reimbursement against him pursuant to its statutory subrogation rights. Were we to hold otherwise, Statile would get the benefit of having had the State Bar reimburse the Barbettini trusts and Nicholas for his wrongdoing, without any obligation to pay a debt for which he is primarily (if not solely) responsible.

We emphasize that the bar's subrogation rights are granted by statute and do not arise by contract. California courts have recognized that statutory subrogation rights may be greater than those that arise by common law. "The effect of the statutory language as to subrogation is not to afford the uninsured tortfeasor an advantage but is to place in the hands of the injured person's insurer the right to enforce the tortfeasor's liability 'to the extent that payment was made' by the insurer." (*Johnson v. Oliver* (1968) 266 Cal.App.2d 178, 181–182 [72 Cal.Rptr. 137] [insurer's settlement with insured for uninsured motorist insurance did not limit insurer's ability to pursue cause of action against tortfeasor].) In *Phoenix of Hartford Ins. Companies v. Colony Kitchens* (1976) 57 Cal.App.3d 140 [128 Cal.Rptr. 893], the court analyzed the then current version of Insurance Code section 11580.2, subdivision (g) (governing uninsured motorist claims), which is similar to section 6140.5, subdivision (b). (*Phoenix*, at p. 143.) The statute provided: " 'The insurer paying a claim under an uninsured motorist endorsement or coverage shall be entitled to be subrogated to the rights of the insured to whom such claim was paid against any persons causing such injury . . . to the extent that payment was made. Such action may be brought within three years from the date that payment was made hereunder.' " (*Ibid.*, quoting Ins. Code, § 11580.2, subd. (g).) The court held that the insurer's cause of action under the statute was barred where it was added as a plaintiff in an insured's action after the statute of limitations on the *insurer's* (as opposed to the insured's) claim under the Insurance Code had run. (*Phoenix*, at pp. 142–143, 145.) The *Phoenix* court noted that rights under the uninsured motorist statute were statutory; that a cause of action under the statute "is a cause of action in favor of the insurer; is not a cause of action in favor of the insured; must be brought by the insurer; and may not be brought by the

insured."[10] (*Phoenix*, at p. 145; see also *West American Ins. Co. v. Chalk* (1989) 213 Cal.App.3d 825, 830 [261 Cal.Rptr. 837] [because subrogation rights provided in uninsured motorist statute are statutory and not common law rights, principle that an insurer can have no greater rights than insured as subrogor are inapplicable].)

■ Although the bar did not make payments here as an insurer, its subrogation rights were nonetheless statutory and not derivative. This is reflected in section 6140.5, subdivision (b), which provides that the bar may bring an action to enforce its subrogation rights within three years of paying an applicant, regardless of which statute of limitations applies to an applicant's claim against an attorney. It follows that the bar acquired a cause of action against Statile separate from a cause of action held by the various applicants. In fact, because the State Bar as a subrogee has no contractual relationship with Statile, we doubt that any unilateral action by Statile (or any action by Statile and the claimants) could ever alter his statutory obligation to the bar. We need not decide here whether the parties *could* have limited the bar's subrogation rights, however, because the settlement agreement specifically provided that Statile would not object to the bar paying the settling plaintiffs, and thus preserved the bar's right to pursue its subrogation rights granted by statute.

■ The bar argues the applicability of surety law to the present case, again by analogy. In general, where a surety is contractually obligated to pay for a debt owed to a creditor, the debtor's alteration of his obligation to the creditor also affects the obligation of the party who promised to pay the underlying debt. As Statile correctly notes, however, the State Bar is not a surety. "A surety . . . is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." (Civ. Code, § 2787.) Payments made by the CSF are by statute discretionary (§ 6140.5, subd. (a); CSF rule 2), a fact recognized by the parties below when they stipulated that "[a]ll payments made from the CSF are made entirely at the discretion of the CSF." There is likewise no preexisting contractual relationship between the State Bar and applicants when they seek reimbursement from the CSF. Indeed, CSF rules specifically provide that no client or member of the public shall have any right in the CSF as a creditor. (CSF rule 2.) The CSF therefore does not "promise" to answer for any attorney's debt, and is not a surety (or insurer, for that matter).

---

[10] By contrast, in *Commercial Union Assurance Co. v. City of San Jose, supra,* 127 Cal.App.3d 730, the court concluded that an insurer's right to recover on an insured's cause of action that was not granted by statute was barred when the statute of limitations ran on the insured's claim; the insurer's payment to the insured did not trigger the limitations period. (*Id.* at pp. 733, 735.) The court distinguished the right of an insurer to be subrogated to the rights of its insured from statutory subrogation, where a subrogee may have greater rights (such as a longer statute of limitations) than those possessed by the insured. (*Id.* at pp. 734, 736.)

For that reason, the surety cases, upon which both parties rely, are inapposite. Statile directs us to *R.P. Richards, Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146 [99 Cal.Rptr.2d 425], which held that a settlement agreement between a general contractor and a subcontractor exonerated the general contractor's surety (the issuer of a stop notice release bond). (*Id.* at pp. 150–151.) The promisee's (subcontractor's) release of the principal (general contractor) extinguished the principal obligation and impaired the promisee's rights and remedies against the principal within the meaning of Civil Code section 2819,[11] which therefore released the surety of its obligation to pay on the stop notice release bond. (*R.P. Richards, supra,* at pp. 154–155.) It is logical that where a surety is under a contractual obligation to pay on a stop notice release bond because of a debt allegedly owed to a creditor, and the debtor alters the obligation to the creditor, the surety is released from its obligation. Here, however, the bar was under no contractual obligation to pay Statile's debt, and therefore there was no preexisting obligation to be altered by the settlement agreement. Moreover, *R.P. Richards* did not address the question of whether the surety could pursue reimbursement from the primary obligor for any money paid to the creditor, because, unlike the bar, it never paid money to the creditor.

To support its position, the bar relies on the Restatement of Security, section 122, and comment d thereto,[12] which provide that a reservation of rights against a surety in a settlement agreement preserves the right of the surety to pursue reimbursement against a principal. We note, however, that this section of the Restatement of Security has been superseded by section 39 of the Restatement Third of Suretyship and Guaranty, which substantially revises the law upon which the parties focus on appeal.[13] (*Axess Intern., Ltd. v.*

---

[11] The statute provides: "A surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended. However, nothing in this section shall be construed to supersede subdivision (b) of Section 2822."

[12] The Restatement provides: "Where the creditor releases a principal, the surety is discharged, unless [¶] . . . [¶] . . . the creditor in the release reserves his rights against the surety." Comment d provides, in relevant part, that "[w]here the creditor releases the principal but reserves his rights against the surety, this is construed as a covenant not to sue the principal. . . . The creditor, by a release with reservation of rights against the surety, was in effect notifying the principal that, in spite of the release, the surety might pay as the result of the compulsion or voluntarily and that the principal would then be liable to reimburse the surety. Since the release was regarded as only a covenant not to sue, even the surety's right of subrogation was technically preserved. The reservation of rights showed that the creditor had no intention to release the surety." (Rest., Security, § 122, com. d, p. 324.)

[13] Neither party recognizes that Section 122 of the Restatement of Security has been thus superseded. Section 39 of the revised Restatement Third of Suretyship and Guaranty provides: "To the extent that the obligee releases the principal obligor from its duties pursuant to the underlying obligation: [¶] (a) the principal obligor is also discharged from any corresponding

*Intercargo Ins. Co.* (9th Cir. 1999) 183 F.3d 935, 939; *Hall & Son v. Ace Masonry* (2003) 260 Mich.App. 222 [677 N.W.2d 51, 56, fn. 4].) The principles set forth in either Restatement are not persuasive here, however, because the bar is not a surety. For the same reason, cases interpreting section 122, upon which the bar relies, are likewise inapposite.[14]

The bar directs us to no California case that addresses this issue: where an injured party releases a tortfeasor but reserves its right against a party with statutory subrogation rights, is that party later permitted to seek reimbursement from the tortfeasor if it pays money that the tortfeasor owed the injured party? Our independent research likewise has not revealed any California case that has addressed this precise question.[15] Although Statile had no specific knowledge that the bar would pay the Barbettini trusts and Nicholas

duties of performance and reimbursement owed to the secondary obligor unless the terms of the release effect a preservation of the secondary obligor's recourse (§ 38) . . . ." Section 38 provides: "(1) When an obligee releases the principal obligor from . . . a duty to pay money pursuant to the underlying obligation, the release or extension effects a 'preservation of the secondary obligor's recourse' with respect to that duty if the express terms of the release . . . provide that: [¶] (a) the obligee retains the right to seek performance of the secondary obligation by the secondary obligor; and [¶] (b) the rights of the secondary obligor to recourse against the principal obligor (§§ 21–28) continue as though the release . . . had not been granted. [¶] (2) When the obligee effects a preservation of the secondary obligor's recourse in conjunction with a release . . . , the principal obligor's duties of performance and reimbursement and the secondary obligor's rights of restitution and subrogation continue as though the release . . . did not occur." As the comments to these sections make clear, this revision of the law as previously stated in section 122 of the Restatement of Security was enacted to protect a settling principal obligor from being surprised by a continuing duty of performance to a secondary obligor. (Rest.3d Suretyship and Guaranty, § 38, com. a, pp. 163–165; *id.,* § 39, coms. b, c, pp. 169–170.) Thus, if applicable to the present case, the revised Restatement would support Statile's position, rather than that of the bar.

[14] The bar relies on *Hendershot v. Charleston Nat. Bank* (Ind. 1990) 563 N.E.2d 546, 547, in which the court concluded that a surety was not released from his obligation where a creditor settled with and released a primary obligor but specifically reserved its rights of recourse against the surety. The holding interprets the Restatement of Security, section 122, which was superseded by the Restatement Third of Suretyship and Guaranty. The bar also cites *Ellis v. Jewett Rhodes Motor Co.* (1938) 29 Cal.App.2d 395 [84 P.2d 791], which held that payment by a tortfeasor in exchange for a covenant not to sue did not release a joint tortfeasor (or its insurer) where there was an express reservation of rights against the joint tortfeasor. (*Id.* at pp. 396, 400.) The case did not address a situation where a party was seeking to enforce any subrogation rights.

[15] However, in the insurance context, California courts have recognized that where a tortfeasor obtains a release from an insured with knowledge that the insured has already been indemnified by an insurer, the release of the tortfeasor does not bar the subrogation rights of the insurer. (*Conservatorship of Edwards* (1988) 198 Cal.App.3d 1176, 1184 [244 Cal.Rptr. 330] [dicta].) Of the two types of cases argued to be applicable here by analogy, we find insurance cases analyzing an insurer's subrogation rights more analogous to the factual scenario we consider here. That is because the relevant insurance cases generally consider situations where insurers reimburse parties who suffered losses and then seek repayment from tortfeasors, much the way the bar paid the applicants and then sought reimbursement from Statile. By contrast, the relevant surety cases analyzing subrogation rights generally consider

at the time he settled their lawsuits against him, he certainly knew that was a possibility (and perhaps a probability, given his concurrent agreement not to object to the applications), and it therefore would be unfair to disallow the bar's subrogation rights here.

If Statile's position were correct, it would work a great injustice to the bar and to the CSF, and ultimately would result in all members of the State Bar in essence paying for the harm that Statile alone caused—a harm that he alone should ultimately be responsible for. Carried to its logical conclusion, under Statile's logic, any member of the bar who caused financial loss to his clients through his wrongdoing could arguably settle a civil suit brought by the clients for pennies on the dollar, preserve the clients' right to seek reimbursement from the CSF, shift responsibility for reimbursement to the CSF, and escape liability for the majority of the monetary loss occasioned by his misconduct. Of course, this injustice would be especially egregious if the CSF had no notice of the settlement prior to acting upon the application for reimbursement. For example in the present case, had the State Bar paid the Barbettini trusts and Nicholas without notice of the settlement agreement, it would be fundamentally inequitable to hold that the settlement agreement (to which the bar was not a party and in which the bar had no role in negotiating) limited its subrogation rights.

In sum, we conclude that neither the statutory scheme nor the settlement agreement in the present case limits the bar's subrogation rights against Statile. The trial court therefore erred when it concluded that the settlement agreement limited the bar's right to recover from Statile. In light of our conclusion, we need not address many of the bar's various other arguments on appeal, such as whether the settlement agreement was "illegal,"[16] whether affirming the judgment would serve as a disincentive to future settlements, or whether there was a "failure of proof" as to whether the parties to the settlement agreement entered into a release of claims.

We do find it necessary, however, to address certain other issues raised on appeal that are likely to arise on remand. The parties on appeal agree on the basic proposition that the State Bar is subrogated to the rights of the Barbettini trusts and Nicholas, but focus almost exclusively on what that means in practice. Having concluded that the State Bar is entitled to

situations where the party who suffered a loss seeks reimbursement from a surety that refuses to pay because of a change in the surety relationship. Here, the issue is not whether the parties who suffered a loss will be reimbursed by the subrogee (the bar), but whether the original tortfeasor (Statile) will have to pay the subrogee.

[16] Although we note that, for all the reasons previously stated, permitting such a settlement would certainly appear to be contrary to public policy, by shifting responsibility for an attorney's wrongdoing to the CSF, and by extension, to all members of the State Bar, if the settlement did indeed limit the bar's subrogation rights.

reimbursement to the extent of its payment to the applicants notwithstanding the settlement agreement, we next consider whether the parties may litigate on remand whether the bar is entitled only to less than full reimbursement.

### C. Collateral Estoppel Applies.

The State Bar determines whether it will reimburse an applicant, and it must then bring a separate action to enforce its rights against the alleged wrongdoer. (§ 6140.5, subd. (b).) The trial court concluded that the determination that an applicant is entitled to reimbursement from the CSF has no effect on the bar's subsequent action against the offending attorney to pursue its subrogation rights. The court's statement of decision stated: "Decisions by the CSF or the CSF Commission to pay the Applicants did not constitute an adjudication of the Applicants' rights against Statile at the time of payment, and did not establish State Bar's rights of subrogation against Statile, and such decisions, therefore, have no *res judicata* effect in these regards against Statile." On appeal, the State Bar claims that collateral estoppel, a different but related legal doctrine, precludes Statile from challenging the CSF's decision to reimburse various applicants. We agree.

" 'Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings.' [Citation.] The doctrine applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.] The party asserting collateral estoppel bears the burden of establishing these requirements.' " (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [38 Cal.Rptr.3d 220, 126 P.3d 1040] (*Pacific Lumber*).) There is no dispute that the fourth and fifth elements are met here. Because the time for challenging the CSF's decisions to reimburse the applicants by writ of mandate has long since passed, those decisions are final and on the merits. Statile, the party against whom preclusion is sought, is the same as the party to the former proceeding.

The trial court concluded that the first element did not apply here: namely, that the applicants' rights against Statile at the time of payment by the CSF and the bar's rights of subrogation against Statile (the issues to be determined

in this action) were not identical to the CSF's decision to pay the applicants.[17] Having concluded, however, that the State Bar is entitled to subrogation *to the extent of its payment* to the various applicants (§ 6140.5, subd. (b)), nothing remains to be determined upon remand. The CSF's decision to pay the applicants, in the amount it did, in fact determined the amount that Statile now owes to the bar pursuant to the bar's statutory right of subrogation, under the specific language of section 6140.5, subdivision (b). In light of this conclusion, it is also clear that the second and third elements of collateral estoppel are met here. The issue of whether to reimburse the applicants was actually litigated[18] and necessarily decided in the former proceeding.

Because Statile is collaterally estopped from arguing that the bar is not entitled to full reimbursement for the amount the CSF paid the Barbettini trusts and Nicholas, judgment should be entered in the bar's favor on those claims.

### D. *No Right of Reimbursement in Form of Bar Dues.*

The State Bar argues in passing that it was entitled to full reimbursement pursuant to section 6140.5, subdivisions (c) and (d), in addition to subdivision (b). Although we have concluded that the bar is entitled to full reimbursement pursuant to section 6140.5, subdivision (b), the same is not true with respect to subdivisions (c) and (d). As set forth above, subdivision (c) provides that an attorney shall reimburse the CSF as a condition of continued practice, or, in the case of a member who resigned, as a condition of

---

[17] Although the trial court found that res judicata (as opposed to collateral estoppel) did not apply, we note that both doctrines require that " '(1) [a] claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceedings.' " (*People v. Barragan* (2004) 32 Cal.4th 236, 253 [9 Cal.Rptr.3d 76, 83 P.3d 480].) Collateral estoppel has the additional requirements that the issue to be precluded was actually litigated and necessarily decided. (*Pacific Lumber, supra,* 37 Cal.4th at p. 943.) By finding that the issue determined by the CSF was not identical to the issue to be decided in this action, the trial court necessarily found that neither res judicata nor collateral estoppel applied.

[18] Statile is correct that the issue of whether to pay the applicants was not "litigated," in the sense that the CSF's decisions were based solely on evidence provided by one side. This was true only because Statile did not object to the CSF's notices of intention to pay the applicants, pursuant to the terms of the settlement agreement. Having failed to object, and having failed to seek a writ of mandate pursuant to Code of Civil Procedure section 1094.5 (CSF rule 17) challenging the CSF's final determinations to pay the applicants, Statile waived his current claims on appeal that CSF notice and hearing procedures do not satisfy due process, and that the bar is not entitled to full reimbursement. (*Mola Development Corp. v. City of Seal Beach* (1997) 57 Cal.App.4th 405, 410 [67 Cal.Rptr.2d 103] [party's failure to challenge quasi-judicial decision which could be challenged by administrative mandamus may collaterally estop later action].)

reinstatement of membership. Subdivision (d) provides that any assessment against an attorney pursuant to subdivision (c) that is part of an order imposing a public reproval on a member or is part of an order imposing discipline or accepting a resignation with a disciplinary matter pending, may also be enforced as a money judgment.

The bar certainly would be entitled to full reimbursement (plus interest and costs) from Statile if he ever seeks "reinstatement of membership" (§ 6140.5, subd. (c)), as Statile acknowledges on appeal. Had Statile been an active member of the bar when the CSF reimbursed the applicants, he likewise would have been required to repay the full amount (again, plus interest and costs) "as a condition of continued practice." (*Ibid.*) However, because the Supreme Court accepted Statile's resignation from the bar months before the CSF issued its first notices of intent to pay the applicants, and Statile has not sought to practice law since his resignation, section 6140.5, subdivision (c) (requiring full reimbursement as a condition of continued practice or reinstatement) is inapplicable here.[19] Section 6140.5, subdivision (d) provides that "[a]ny assessment against an attorney pursuant to subdivision (c) that is part of an order imposing a public reproval on a member or is part of an order imposing discipline or accepting a resignation with a disciplinary matter pending, may also be enforced as a money judgment." Because no such "assessment" has been made, subdivision (d) likewise is inapplicable.

### E. *The Trumble Claim.*

The bar sought reimbursement in this action for $8,246.95 that the CSF paid on the Trumble claim, which was not covered by the settlement agreement. Statile's counsel acknowledged below that the claim was properly before the court, but that "we simply need to see [the bar's] evidence and proof." The parties presented evidence regarding the claim, and the trial court heard argument about it.

On March 5, 2007, the bar filed a proposed statement of decision that did not specifically mention the Trumble claim, except to cite to an attached table that listed the Trumble claim along with the claims by Nicholas and the Barbettini trusts. On March 19, 2007, the trial court issued its tentative statement of decision; the statement did not mention the Trumble claim. The

---

[19] CSF rule 5(b) provides that "[a] lawyer shall reimburse the Fund for all moneys paid out as a result of his or her conduct, with interest, and an assessment of the procedural costs of processing the claims. . . ." This language is consistent with section 6140.5, subdivision (c), which requires reimbursement of "all moneys paid out as a result of [an attorney's] conduct with interest, in addition to payment of the assessment for the procedural costs of processing the claim." We agree with Statile that rule 5(b) governs payments covered by section 6140.5, subdivision (c).

bar objected to the tentative statement, but it did not argue that the trial court had failed to address the Trumble claim. The trial court's final statement of decision did not address the Trumble claim.

Without any citation to the record or any legal authority whatsoever, the bar argues on appeal: "The court denied relief for the Trumble claim, without any findings and without any reason. Accordingly, Appellant is entitled to reimbursement from STATILE for the payments made on the Trumble claim." In general, "[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) "[I]f the statement [of decision] fails to resolve a controverted issue or is ambiguous the defects must be brought to the court's attention to avoid presumptions in favor of the judgment." (*Id.* at p. 1136 [litigant who claimed on appeal that trial court's statement of decision failed to decide two matters on which a decision was requested waived right to complain about error on appeal; judgment therefore affirmed]; cf. Code Civ. Proc., § 634 [when statement of decision does not resolve a controverted issue and record shows that *omission was brought to attention of trial court*, it shall not be inferred on appeal that the trial court decided in favor of the prevailing party as to those facts or on that issue].) "Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision. Securing a statement of decision is the first step in avoiding the doctrine of implied findings, but is not always enough: The appellant also must bring ambiguities and omissions in the factual findings of the statement of decision to the trial court's attention. If the appellant fails to do so, the reviewing court will infer the trial court made every implied factual finding necessary to uphold its decision, even on issues not addressed in the statement of decision. The question then becomes whether substantial evidence supports the implied factual findings." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 [58 Cal.Rptr.3d 225].)

In light of our conclusion that the bar's decisions to reimburse the applicants and Statile's failure to challenge those decisions in superior court entitle the bar to full reimbursement pursuant to its subrogation rights, there is no substantial evidence to support the trial court's implied finding that the bar was not entitled to reimbursement for the money it paid on the Trumble claim. On remand, the trial court is directed to enter judgment for the State Bar on this claim as well.

## III.

### DISPOSITION

The judgment is reversed. On remand, the trial court is directed to enter judgment in favor of the State Bar on all its claims. Appellant shall recover its costs on appeal.

Reardon, Acting P. J., and Rivera, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 11, 2009, S169462. Werdegar, J., did not participate therein.