Filed 1/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>JAVIER ESCOBAR et al.,<br><br>     Defendants and Respondents. | H038121<br>(Santa Clara County<br>Super. Ct. No. 1-11-CV201680) |

Government Code section 23004.1 provides a means for counties to obtain recompense for medical treatment rendered at county expense to persons injured through the torts of others. The statute grants counties a direct right of action against the tortfeasor, as well a lien on any judgment secured by the injured person against the tortfeasor. The question presented by this, the first of three related appeals, is what happens to the county's direct right of action against the tortfeasor when the injured person obtains a judgment against the tortfeasor, the county duly asserts its lien, and the tortfeasor issues a check in the amount of the lien, but makes it payable jointly to the county and the injured person, who refuses to endorse the check over to the county? Here the county filed a new suit seeking to assert its statutory cause of action against the tortfeasor. The trial court held in essence that the county's cause of action had been extinguished by the injured person's judgment and that the only remedy against the tortfeasor was to apply to the court that rendered the judgment for assistance in enforcing the lien. We hold that, on the contrary, an adjudicated tortfeasor holding disputed funds

it knows are encumbered by a public hospital lien cannot avoid liability by simply turning control of the funds over to the injured person. It must instead avail itself of the procedures provided for neutral stakeholders caught between rival claimants—most obviously the device of *interpleader*, under which it can deposit the disputed funds in court, requiring the contestants to appear and present their claims. What it cannot do is simply shirk its statutory obligations by turning disputed funds over to the injured person in a check payable to both contestants. By doing so it satisfies neither the judgment nor the lien, and it remains subject to the statutory liability in favor of the county unless and until the county recovers the amount to which it is entitled under the statute. Accordingly, the trial court here erred by sustaining the tortfeasor's demurrer, and the resulting judgment must be reversed.

## BACKGROUND[1]

Because the matter arose on demurrer, we accept as true all well-pleaded allegations of the complaint—in this instance, the first amended complaint filed by plaintiff County of Santa Clara (County) on September 23, 2011, against Javier Escobar, Jose Tinoco, and Fresh Express, Inc. (Fresh Express). It is there alleged that on September 23, 2009, Tinoco, while employed by Fresh Express, injured Escobar by negligently operating a vehicle. Escobar thereafter received treatment at Santa Clara Valley Medical Center, a hospital owned and operated by plaintiff County. The reasonable value of the care and services provided by County is alleged to be $1,249,545.38. Escobar sued Tinoco and Fresh Express in Monterey County Superior Court, where he eventually recovered a judgment for $5,689.624.87. County asserted a

---

[1] On our own motion, we take judicial notice of the records in *Escobar v. Fresh Express, Inc.; County of Santa Clara* (Jan. 28, 2016, H038185) [nonpub. opn.] (*Escobar II*), and *County of Santa Clara v. Escobar* (Jan. 28, 2016, H039600) [nonpub. opn.] (*Escobar III*), insofar as they assist in providing a complete picture of the procedural background for the present appeal.

2

lien against the judgment pursuant to Government Code section 23004.1 (section 23004.1).  Escobar's attorney, who had stipulated at trial that County's bill reflected reasonable and necessary charges, now contended that County was not entitled to the full amount of its bill but only to some lesser amount in accordance with schedules promulgated by the Workers Compensation Appeals Board (WCAB or Board).  Fresh Express did not pay County, but instead delivered a check in the amount of $1,249,545.38 to Escobar's attorney, Joseph Carcione, Jr., payable to both County and Carcione's firm.

Based on these allegations, County asserted the following causes of action: (1) Against Fresh Express, for statutory liability pursuant to section 23004.1; (2) against Fresh Express and Escobar for money had and received; (3) against Escobar for value of services rendered (quantum meruit); (4) against Escobar, for imposition of a constructive trust; and (5) against all defendants, for declaratory relief.

Fresh Express demurred generally to the complaint, arguing that it could have no further liability in the matter because an acknowledgment of satisfaction of judgment had been entered in the Monterey court.  It also contended that Escobar's injuries had arisen out his employment, such that exclusive jurisdiction over the controversy lay in the WCAB.

The trial court sustained the demurrer without leave to amend, ruling that in view of Escobar's successful prosecution of his claim, "the County can no longer pursue its own action against Fresh Express . . . , but must instead seek enforcement of the lien," which the court ruled County could only do in the Monterey court.  County filed this timely appeal.

3

## DISCUSSION[2]

### *I. Actual Controversy*

Fresh Express first contends that its demurrer was well taken because there was no actual controversy between it and County. This argument fails for a number of reasons. First, the requirement of an actual controversy is peculiar to a cause of action for declaratory relief. (See Code Civ. Proc., § 1060; *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582.) County also asserted claims against Fresh Express for damages, which are unaffected by the presence or absence of an "actual controversy." Further, an actual controversy obviously *does* exist between County and Fresh Express. County contends that Fresh Express remains liable to it despite its various efforts to obstruct County's claims, while Fresh Express contends that it discharged its entire responsibility in the matter by surrendering the disputed funds, or a check representing them, to Escobar's attorney. It may be questionable whether the declaratory relief cause of action really adds anything to County's claims for damages, but we have no doubt that it alleges an actual and present controversy. Fresh Express offers no coherent argument to the contrary.

However, if Fresh Express's underlying argument on this point were sound, it might indeed support a conclusion that County is not entitled to a *favorable* declaration— or other relief—because of its position as a subrogee of Escobar, who has assertedly excluded Fresh Express from further liability by acknowledging satisfaction of the judgment. As formulated in Fresh Express's brief, the argument seems to flow as follows: (1) County was subrogated to Escobar's claim against Fresh Express; (2) as a

---

**2** On County's motion to consolidate this appeal with *Escobar II*, *supra*, we ordered the matters considered together for purposes of briefing, oral argument, and decision. On further review we have concluded that despite their common factual background, each case presents more unique issues than shared ones, warranting separate opinions. We vacate our previous order insofar as it directed otherwise.

4

subrogor, County stood in Escobar's shoes and was subject to any defense Fresh Express could raise against Escobar; (3) having acknowledged satisfaction of judgment, Escobar would be barred from obtaining any further relief against Fresh Express; (4) therefore, "the County by operation of law also has no controversy with Fresh Express."

This argument cannot be sustained. The first of its flaws is that the record contains no competent evidence that Escobar has ever acknowledged satisfaction of the judgment. So far as we can determine, all copies of the acknowledgment in this record—and in the records of the two companion appeals—reflect the satisfaction of a judgment in favor not of Escobar, but of Jose Guadalupe Montoya-Medina, a co-plaintiff in the Monterey action. Because this deficiency has gone unremarked by the parties, however, we place little weight on it.

More tellingly, even if factually grounded in matters cognizable on demurrer, the argument fails to sustain the conclusion that County is not entitled to relief. Fresh Express cites *Patent Scaffolding Co. v. William Simpson Construction Co.* (1967) 256 Cal.App.2d 506, 510, for the proposition that "any defense that can be asserted against a subrogor can also be asserted against a subrogee." What that decision really says is that "*generally*, any defenses or counterclaims which could have been asserted against the subrogor-insured can also be asserted against the subrogee-insurer." (*Ibid.*, italics added.) The "generally" is critical here, for one well-known exception to the rule is that the subrogor (here, Escobar) cannot defeat the subrogee's (County's) claim by conniving with the third party (Fresh Express) to cut off the subrogee's rights. " '[W]here the tortfeasor [i.e., third party] obtains a release from the insured [subrogor] with knowledge that the latter has already been indemnified by the insurer [subrogee], such release of the tortfeasor does not bar the right of subrogation of the insurer.' [Citations.]" (*Conservatorship of Edwards* (1988) 198 Cal.App.3d 1176, 1184.) Although County has not, technically speaking, *indemnified* Escobar, we think that distinction is

5

inconsequential. The argument asserted by Fresh Express rests entirely on statutory language declaring County subrogated to Escobar's rights. (Section 23004.1, subd. (a).)[3] Fresh Express cannot assert defenses arising from that language without also accepting the limitations imposed on those defenses by principles of subrogation. Fresh Express has failed to establish that those principles pose any impediment to County's claims. (Cf. *State Bar of California v. Statile* (2008) 168 Cal.App.4th 650, 666 [expressing doubt, despite statutory language of subrogation, that "unilateral action" by attorney, or agreement between attorney and aggrieved clients, could "alter" attorney's "statutory obligation" to reimburse client security fund for sums paid to clients].)

## II. Statutory Cause of Action

### A. Introduction

The trial court sustained Fresh Express's demurrer on the rationale that by virtue of the judgment in Escobar's case, County's only extant remedy against Fresh Express is to seek to enforce County's judgment lien in that action—which, the court implicitly concluded, could only be done in the Monterey court, where the judgment was rendered. County contends that, on the contrary, it is entitled to pursue a statutory cause of action against Fresh Express under section 23004.1 unless and until its lien is satisfied. Since the question turns on the meaning and effect of a statute, "[w]e begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.]." (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230.) "[I]f those words have a well-

---

[3] The parties have made nothing of the statute's disjunctive language, i.e., "the county shall have a right to recover from said third person the reasonable value of the care and treatment so furnished . . . , *or* shall, as to this right, be subrogated to any right or claim that the injured or diseased person . . . has against such third person . . . ." (§ 23004.1, subd. (a), italics added.)

6

established meaning . . . , there is no need for construction and courts should not indulge in it." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 24 (*Arnett*); see *Yassin v. Solis* (2010) 184 Cal.App.4th 524, 531, quoting *People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708-709 [" 'If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.]' "].)

As most pertinent here, section 23004.1 grants counties "a right to recover" from a tortfeasor the reasonable value of medical services rendered by the county to a person injured by the tortfeasor. (Section 23004.1, subd. (a).) It authorizes the county to file suit on its own behalf, but goes on to state that if the injured person brings an action, "the county's right of action shall *abate during the pendency of such action*, and *continue as a first lien* against any judgment recovered by the injured or diseased person." (*Id.*, subd. (b), italics added.)[4] Determination of the questions before us requires closer examination

---

[4] Section 23004.1 provides, "(a) Subject to the provisions of Section 23004.3, in any case in which the county is authorized or required by law to furnish hospital, medical, surgical, or dental care and treatment, including prostheses and medical appliances, to a person who is injured or suffers a disease, under circumstances creating a tort liability upon some third person to pay damages therefor, the county shall have a right to recover from said third person the reasonable value of the care and treatment so furnished or to be furnished, or shall, as to this right, be subrogated to any right or claim that the injured or diseased person, his guardian, personal representative, estate, or survivors has against such third person to the extent of the reasonable value of the care and treatment so furnished or to be furnished.

"(b) The county may, to enforce such rights, institute and prosecute legal proceedings against the third person who is liable for the injury or disease in the appropriate court, either in its own name or in the name of the injured person, his guardian, personal representative, estate, or survivors. Such action shall be commenced within the period prescribed in Section 340 of the Code of Civil Procedure. In the event that the injured person, his guardian, personal representative, estate, survivors, or either of them brings an action for damages against the third person who is liable for the injury or disease, the county's right of action shall abate during the pendency of such action, and continue as a first lien against any judgment recovered by the injured or diseased person, his guardian, personal representative, estate, or survivors, against the third person who is liable for the injury or disease, to the extent of the reasonable value of the care and treatment so

7

of these two clauses, i.e., "[a county's] right of action . . . shall abate during the pendency of such action" (the abatement clause), and "[it] shall . . . continue as a first lien against any judgment . . . ." (the lien clause).

## B.  *Abatement Clause*

Standing alone, the abatement clause is wholly unambiguous:  It means that the county's right of action against the tortfeasor is *suspended* for the duration of the injured person's suit.  To speak of "abating" a right of action is to use a settled term of legal art, which courts will construe according to its accepted specialized meaning.  (See *Arnett*, *supra*, 14 Cal.4th at p. 19 ["when a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute"]; see *ibid*., quoting *Bradley v. United States* (1973) 410 U.S. 605, 609 ["Rather than using terms in their everyday sense, '[t]he law uses familiar legal expressions in their familiar legal sense.' "]; *Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 829 ["when the Legislature uses a term of art, a court construing that use must assume that the Legislature was aware of the ramifications of its choice of language"]; *Texas Commerce Bank v. Garamendi* (1992) 11 Cal.App.4th 460, 475 [unless a contrary intention is "clearly indicated by the statute," courts will presume Legislature intended legal, technical, or commercial terms of art to convey "their established legal or technical meanings"].)

To "abate" a right of action is to *suspend* its prosecution due to some impediment that, without defeating the underlying cause of action, prevents the *present* maintenance

furnished or to be furnished. When the third person who is liable is insured, the county shall notify the third person's insurer, when known to the county, in writing of the lien within 30 days following the filing of the action by the injured or diseased person, his guardian, personal representative, estate, or survivors, against the third person who is liable for the injury or disease; provided, however, that failure to so notify the insurer shall not prejudice the claim or cause of action of the injured or diseased person, his guardian, personal representative, estate, or survivors, or the county."

8

of suit.[5]  The suspension may be accomplished by a variety of procedures.  Traditionally, if an action was found subject to abatement it was dismissed *without prejudice*. (*Drummond v. Desmarais* (2009) 176 Cal.App.4th 439, 458-459; see, e.g., *Kroff v. Larson* (1985) 167 Cal.App.3d 857, 861 [judgment on demurrer based on prematurity of action "does not act as a bar to a subsequent suit"].)  Some cases have suggested that abatement is properly effected by granting a *continuance* of the abated action.  (E.g., *Colvig v. RKO General, Inc.* (1965) 232 Cal.App.2d 56, 71 ["Where the plea is sustained the order should be merely an abatement or continuance of the second action, and it is error to give judgment for the defendant on the merits."]; *Neblett v. Pacific Mut. Life Ins. Co. of Cal.* (1943) 22 Cal.2d 393, 400 ["Pendency of an appeal in one action is not a bar to the maintenance of a second action raising similar issues if, as here, no abatement or continuance is sought at trial of the second action."]; *Pellissier v. Title Guarantee & Trust Co.* (1929) 208 Cal. 172, 184 [if judgment in first action is on appeal, prevailing

---

[5]  This usage flatly contradicts the assertion by Fresh Express's attorney at the hearing on the demurrer that when a right of action is abated, it "become[s] void."

Of course, "abate" has a number of other meanings in other settings, some of which may more nearly approach the meaning asserted by counsel.  Thus the amelioration of a nuisance or similar condition is referred to as "abatement."  (Code Civ. Proc., § 731; Pen. Code, §§ 11200 et seq.; *Flahive v. City of Dana Point* (1999) 72 Cal.App.4th 241, 244; cf. Health & Saf. Code, § 40001, subd. (b) [authorizing adoption of rules for "the prevention and abatement of air pollution episodes"].)  When an estate lacks sufficient assets to fulfill a bequest, the bequest is said to be "abated."  (See Prob. Code, §§ 21400-21406; *Estate of Buck* (1948) 32 Cal.2d 372, 376.)  Criminal punishment is also said to be "abate[d]" when it is reduced to reflect legislative changes intended to operate retroactively.  (*People v. Roman* (2001) 92 Cal.App.4th 141, 146.)  On the other hand, "abate" is also used to describe the temporary suspension of a legal *process*, such the statute of limitations.  (See Black's Law Dict. (10th ed. 2014), p. 1716, col. 1 [defining "toll": "(Of a time period, esp. a statutory one) to stop the running of; to abate <toll the limitations period>."]; *Don Johnson Productions, Inc. v. Rysher Entertainment* (2012) 209 Cal.App.4th 919, 934 (dis. opn. of Mosk, J.), quoting Garner, Dict. of Modern Legal Usage (2d ed. 1995), p. 884 [to same effect].)

9

party "may in a subsequent action plead [the] prior action in abatement, and lay the foundation for securing a continuance of the trial of the second action until the final determination of the first"].)

In one particular situation—where the cause of abatement is the pendency of another lawsuit on the same cause of action—a statute prescribes entry of an *interlocutory judgment* suspending proceedings "until the final determination of th[e] other action." (Code Civ. Proc., § 597.) This provision " 'permit[s] the trial court to retain jurisdiction over the subsequent action.' " (*Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, 336, fn. 2, quoting *Lord v. Garland* (1946) 27 Cal.2d 840, 851.) Then, if " 'the prior litigation is not determined upon the merits, the trial court should hear and decide the rights of the parties in accordance with the issues presented by the pleadings in the second action.' " (*Ibid*.)

Where another mode of abatement is not already prescribed, modern authorities generally favor a simple *stay*, to be lifted if and when the cause of abatement dissipates. (*Drummond v. Desmarais*, *supra*, 176 Cal.App.4th 439, [458-459]; *People ex rel. Garamendi v. American Autoplan, Inc.* (1993) 20 Cal.App.4th 760, 771 ["Where abatement is required, the second action should be stayed, not dismissed."]; *Plant Insulation Co. v. Fibreboard Corp.* (1990) 224 Cal.App.3d 781, 792 [because there was "no reason to divest the court of jurisdiction over appellant's action until a final determination" was obtained in related matter, "the instant action should have been stayed rather than dismissed"].) Indeed, in this context "abate" and "stay" are often viewed as synonymous, or virtually so. (See *People ex rel. Garamendi v. American Autoplan, Inc.*, *supra*, 20 Cal.App.4th 760, 771, fn. 9 [referring to "motions to abate or stay" in earlier decisions]; *Brock v. Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790, 1796 ["Once a court grants the petition to compel arbitration and stays the action at law, the action at law sits in the twilight zone of abatement . . . ."]; *Yarbrough v. Superior*

10

*Court* (1985) 39 Cal.3d 197, 204 [alluding to procedures for determining incarcerated litigant's right to appointed counsel "when abatement or stay of the litigation is contemplated"]; *Muller v. Tanner* (1969) 2 Cal.App.3d 438, 443, fn. 4 [in context of plea of other action pending, "the word abate is used in the sense of a stay of proceedings to await the determination of the prior action on the merits"]; *id.* at p. 444 [distinguishing dismissal order made to control proceedings from "abatement or stay" to be dissolved upon failure to resolve first action on merits]; *Precision Automotive v. Northern Ins. Co. of New York* (1967) 252 Cal.App.2d 1036, 1042 ["this second action should not be terminated . . . at the present time but should only be abated until the issues in the first action have been finally determined"]; *id.* at p. 1044 [trial court directed to "stay[]" action "until the final determination of the first action or until the further order of court"]; *Leeds v. Superior Court In and For Los Angeles County* (1965) 231 Cal.App.2d 723, 724, quoting *Tinney v. Tinney* (1963) 211 Cal.App.2d 548, 553 [" 'The trial court properly acted within its discretion when it chose not to abate or stay the instant action.' "]; *Karp v. Dunn* (1964) 229 Cal.App.2d 192, 195 [in view of earlier action, present matter "should not be terminated at the present time . . . but should only be abated until the issues in the first action have been finally determined"]; *id.* at p. 196 [trial court directed to "stay[]" action "until the final determination of the first action"]; *Muller v. Muller* (1960) 179 Cal.App.2d 815, 818 [duration of "stay by way of abatement" was properly excluded in determining whether action had been pending for five years when dismissal sought for failure to prosecute]; *Kalmus v. Kalmus* (1951) 103 Cal.App.2d 405, 416 [referring to "the rule which applies between courts of different states with reference to 'abatement' of or 'stay of proceedings' by reason of the pendency of two actions predicated on the same cause of action"], disapproved on another point in *Hudson v. Hudson* (1959) 52 Cal.2d 735, 739.)

11

Whatever the precise mechanism for effecting abatement, it possesses two critical features:  it is not a disposition on the merits, and it does not, in most cases, preclude further proceedings on the underlying cause of action.[6]  (See 3 Witkin, Cal. Procedure, *supra*, § 12, p. 73 ["[A] pending action may be stayed or 'abated' (usually temporarily only) for certain defects in pleading or parties . . . ."].)  This contingent and impermanent character is deeply embedded in historic usage.  Pre-code pleading practice recognized a number of special "pleas in abatement" by which various non-merits objections could be lodged at the outset of litigation; these were subject to strict rules, most notably that they must be specially asserted before the submission of any other defensive pleading.  (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1129, p. 556.)[7]  Nothing remains of

---

[6]  Of course, abatement will effect a permanent disposition when the actuating cause can never be lifted.  Thus "when a defendant in a criminal action dies pending appeal from his conviction, the death permanently abates all further proceedings." (*People v. Schaefer* (2012) 208 Cal.App.4th 1283, 1287.)  Traditionally, death of a party also abated a civil action; but if the underlying cause of action survived, the action could be "revived" by substituting the decedent's personal representative into the case.  (See 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, §§ 12 et seq., pp. 73 et seq.; Comment, 4 West. New Eng. L.Rev. 261, 265.)  It is now declared by statute that no civil action is "abated" in these circumstances "if the cause of action survives."  (Code Civ. Proc., § 377.21.)  In other cases, implicitly, the action is still abated—and as in the criminal context, that disposition is necessarily permanent.

[7]  A plea in abatement was distinguished from a plea in bar, which asserted some fatal, incurable obstacle to recovery.  The distinction is concisely illustrated by the rule under which the plea of another action pending on the same cause of action (a plea in abatement) may ripen into res judicata (a plea in bar) if the first action produces a final judgment on the merits.  (E.g., *Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th at p. 336, fn. 2, quoting *Lord v. Garland*, *supra*, 27 Cal.2d 840, 851, italics omitted [" 'If a judgment upon the merits is rendered in the suit first commenced, the party asserting the plea in abatement should be granted leave to amend to plead the res judicata effect of the judgment in bar of the subsequent action."]; *Security Trust & Sav. Bank v. Claussen* (1919) 44 Cal.App. 730, 733 ["If final, the judgment could be interposed as a plea in bar, and if pending on appeal therefrom by plaintiff, then as a plea in abatement . . . ."]; *Pioneer Truck Co. v. Clark* (1919) 44 Cal.App. 477, 480 ["A plea in abatement could be interposed in such second and subsequent actions until the first judgment had become

these strictures except that such objections are sometimes said to be " ' "not favored in law," ' " " ' "strictly construed," ' " and easily forfeited. (*Color-Vue, Inc. v. Abrams* (1996) 44 Cal.App.4th 1599, 1604; see *In re Conservatorship of Oliver* (1962) 203 Cal.App.2d 678, 686 [objection that claim for attorney fees was premature was plea in abatement that could not be raised for first time on appeal]; *Stewart v. San Fernando Refining Co.* (1937) 22 Cal.App.2d 661, 663 [no abuse of discretion in refusing leave to amend answer to assert failure to perfect fictitious business name; defense "was a plea in abatement" and, as such, "not favored in law"]; but see *Conservatorship of Pacheco* (1990) 224 Cal.App.3d 171, 176 [noting criticism of rule].) Most or all of the objections are still recognized, however, and the term "plea in abatement" is still commonly used to describe them. (5 Witkin, Cal. Procedure, *supra*, § 1129, p. 556, citing Code Civ. Proc., § 597; see, e.g., *Cal-Western Business Services, Inc. v. Corning Capital Group* (2013) 221 Cal.App.4th 304, 312 ["A defense based on a suspended corporation's lack of capacity to sue ' "is a plea in abatement . . . ." ' "]; *Tabarrejo v. Superior Court* (2014) 232 Cal.App.4th 849, 867 [lack of standing goes to right to relief and, as such, "is not a plea in abatement, as is lack of capacity to sue"]; *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 45 ["Th[e] assertion of a contractual arbitration agreement constitutes a 'plea in abatement' of the action at law."]; *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1093 [same, failure to obtain leave to sue receiver]; *Fireman's Fund Ins. Co. v. Sparks Const., Inc.* (2004) 114 Cal.App.4th 1135, 1148 [defect in service of process]; *Kroff v. Larson, supra,* 167 Cal.App.3d 857, 861 [prematurity of attorney's suit to recover costs advanced to client in pending action].)

---

final, and a plea in bar then made."].) This terminology still reverberates in Code of Civil Procedure section 597, which authorizes the separate trial of any defense "not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof."

It is an essential characteristic of a plea in abatement that it will not usually prevent the plaintiff from prosecuting the abated cause of action if and when the occasion for abatement is removed. " 'A plea in abatement, without disputing the justness of plaintiff's claim, objects to the place, mode, or time of asserting it and requires *pro hac vice* that the judgment be given for the defendant, leaving it open to renew the suit in another place, or form, or at another time.' " (*V & P Trading Co., Inc. v. United Charter, LLC* (2012) 212 Cal.App.4th 126, 133, quoting *Nevills v. Shortridge* (1905) 146 Cal. 277, 278; see Black's Law Dict. (10th ed. 2014) p. 1338, col. 1 ["A defendant who successfully asserts a plea in abatement leaves the claim open for continuation in the current action or reassertion in a later action if the defect is cured."].) As another panel of this court has noted, such a plea " ' "is essentially a request—not that an action be terminated—but that it be continued until such time as there has been a disposition of the first action." [Citation.]' " (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 253, fn. 26, quoting *Lawyers Title Ins. Corp. v. Superior Court* (1984) 151 Cal.App.3d 455, 459.)

Standing alone, then, section 23004.1's reference to "abate[ment]" strongly suggests that the Legislature did not intend the injured person's bringing of suit to permanently *bar* the county's prosecution of its own right of action, but only that it would *suspend* that right for the stated period of time, i.e., "during the pendency of [the injured person's] action." (Section 23004.1, subd. (b).) The specification of a duration is further evidence that the Legislature did not intend the county's right of action to terminate, but only to be held in abeyance until the injured person's action is no longer pending. "An action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied." (Code Civ. Proc., § 1049.) Obviously, if the lawsuit results in satisfaction of the county's claims, there is no occasion for the county to proceed further

14

against the tortfeasor, and any attempt to do so will be barred on various grounds, including the general prohibition on multiple and duplicative recoveries. But the reference to abatement during the pendency of the lawsuit strongly implies that if the suit ends without satisfaction of the county's lien, the county's own right of action is "revived." (See Black's Law Dictionary (10th ed. 2014) pp. 195-196 [defining "bill of revivor" as "[a] bill filed for the purpose of reviving and continuing a suit in equity when the suit has been abated before final consummation"]; *id.* at p. 1515, col. 1 ["revivor" as "[a] proceeding to revive an action ended because of either the death of one of the parties or some other circumstance"].)[8]

Here the court initially entered judgment on December 14, 2010, and awarded certain costs on April 5, 2011. If the cost award effected an amendment of the judgment—a question we need not address—Escobar's action remained pending until the time to appeal from the latter order expired. (Code Civ. Proc., § 1049.) That would have occurred no later than 180 days after the order was made (Cal. Rules of Court, rule 8.104(a)(1)(C)), or October 2, 2011, a Sunday, making October 3, 2011, the last day Fresh Express could have appealed. The action therefore ceased to be pending as of October 4, 2011.

Ironically, County apparently commenced this action before that date, meaning that a plea in abatement might have lain against its complaint, *when filed*, on the ground that the action was premature under the terms of section 23004.1. But the cause for abatement lifted no later than October 4, which was 17 days before Fresh Express demurred to County's complaint, and more than three months before the demurrer was heard. A plea in abatement is good only as long as the triggering condition lasts. When

---

**8** Witkin criticizes the language of "abatement and revival" where the triggering cause is the death of a party. (3 Witkin, Cal. Procedure, *supra*, § 12, p. 74.) It seems perfectly apt, however, in the present context.

15

the plea rests on the pendency of another action, it must be rejected if the action is no longer pending at the time the plea is considered—regardless of the state of affairs when the action was filed. (See *Karp v. Dunn*, *supra*, 229 Cal.App.2d 192, 195 [dismissal of first action "before any trial of the second action[] completely dispose[s] of the plea of another action pending"].)

The statute's abatement clause was given its natural meaning in *Mares v. Baughman* (2001) 92 Cal.App.4th 672, 679, which County has cited for the proposition that an injured person's lawsuit merely suspends, but does not extinguish, a county's right of action under section 23004.1. The question in that case was whether, in a case covered by section 23004.1, a county may assert a lien against the proceeds of a *settlement* between the injured person and the tortfeasor. The court held that the statute itself did not create a lien in that circumstance because it provides only for a lien "against any judgment." (Section 23004.1, subd. (b).) More pertinently for our purposes, the court also rejected an argument that unless the county were granted an *equitable* lien against the settlement, it would be "unable to recover for the medical services provided."[9] (*Mares v. Baughman, supra,* 92 Cal.App.4th at p. 679.) The court noted that the county's right of action under section 23004.1 was "abated only during the pendency of an action by the injured person . . . . Once the action is no longer pending, should an amount remain due and owing to County for those services, it may pursue its own action."[10]

_____

[9] An "equitable lien" is a remedy allowed when equity and good conscience dictates that a charge should be imposed upon particular property. (See *Campbell v. Superior Court* (2005) 132 Cal.App.4th 904, 912; *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 453.)

[10] The court did not suggest, and we do not mean to suggest, that the disposition of the injured person's action could have no effect on a county's right of action. If the injured person's claims were rejected in a final judgment on the merits, that adjudication would presumably bind the county. Indeed, this may have been the intended effect of the statute's reference to subrogation. Implicit in the court's holding, however, was the proposition that a tortfeasor who *settled* with the injured person, without including the

16

(*Mares, supra*, at p. 678.)  In other words, the county had an adequate remedy in its statutory cause of action, which was revived when the tort action failed to produce a judgment to which a lien could attach.  Here, the same reading of the abatement clause supports the conclusion that County was entitled to proceed upon its statutory right of action when Fresh Express failed to pay it the liened amount.

## C.  Lien Clause

The trial court concluded in essence that once a county's lien has attached to a judgment, as it did here, the county's independent right of action ceases to exist.  The court distinguished *Mares v. Baughman*, *supra*, 92 Cal.App.4th 672, on the ground that the lawsuit there settled before any judgment was entered.  The court did not articulate its reasoning beyond the observation that because Escobar's action had yielded "a judgment on which the County can assert a lien and on which it did, in fact, assert a lien . . . , the County can no longer pursue its own action against Fresh Express . . . , but must instead seek enforcement of the lien."

Nothing in the language of the statute supports this conclusion unless it is the lien clause, under which a county's right of action, having been abated by the injured person's suit, "shall . . . continue as a first lien against any judgment . . . ."  (Section 23004.1, subd. (b).)  The trial court apparently took this language to mean in essence that a county's right of action continues *only* as a lien.  It is of course a "cardinal rule" of statutory construction that a law " 'is to be interpreted by the language in which it is written, and courts are no more at liberty to add provisions to what is therein declared in definite language than they are to disregard any of its express provisions.' "  (*Wells*

---

county, would thereby run the risk that the county might then prosecute its own cause of action under Section 23004.1.  The net effect is to encourage the tortfeasor and the injured person to include the county in any settlement negotiations—an effect the Legislature may be readily inferred to have intended.

17

*Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1097, quoting *People v. Campbell* (1902) 138 Cal. 11, 15; see Code Civ. Proc., § 1858 [not the office of a court to "insert what has been omitted, or to omit what has been inserted"].)  Nothing in the language of the statute "declare[s] in definite language" that the lien, once attached, is all that remains of the county's original right of action.

On the other hand, the construction employed in the lien clause ("continues as a first lien") is unusual, and might support an argument that the statute is ambiguous on this point.  On the one hand, the common meaning of "continue" is "to remain in existence: ENDURE."  (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 250.)  To that extent the clause suggests that the county's right of action persists, notwithstanding the existence of a lien.  However the statute goes on to provide that the right of action continues "*as* a first lien."  It is something of an oxymoron to say that a thing *continues as* a *different* thing.  Insofar as the original thing continues, it remains in existence; yet insofar as it becomes something *else* it has, in at least some sense, *ceased* to exist.  Many would consider it imprecise, if not wrong, to say that a caterpillar continues as a butterfly, or an acorn as an oak.  The original thing *becomes* or *transforms into* something else and, to that extent, no longer exists.  Once they have metamorphosed into their mature forms, the acorn and the caterpillar are gone.  To say that they "continue as" those forms is at best only a rough approximation of the facts—a usage perhaps tolerable for a poetic purpose, but having no proper place in a context demanding precision and concreteness, such as the creation of legal rights and relations.

Nonetheless we note that such a construction is sometimes used, however imprecisely, to convey in common speech the idea of a transformation into something new which replaces the original.  (See Montreal Expos – Wikipedia, the free encyclopedia <https://web.archive.org/web/20150917112943/https://en.wikipedia.org/

wiki/Montreal_Expos> (as of Jan. 28, 2015) ["The team left Montreal following the 2004 season as the franchise was relocated to Washington, D.C. and continues on as the Washington Nationals."].)  This empirical linguistic observation, however, provides no assistance here because the phrase says nothing, by itself, about the *permanence* of the transformation.  We sometimes say that a thing "continues as" something different, while contemplating that it will, or can, *resume its original form*.  (See, e.g., California State Route 1 – Wikipedia, the free encyclopedia, <https://en.wikipedia.org/wiki/ California_State_Route_1> (as of Jan. 28, 2016), fns. omitted ["At the interchange with Highway 156 near Castroville, Highway 1 continues north as a two-lane rural road to Moss Landing.  [¶]  Highway 1 becomes a freeway once again just before entering into Santa Cruz County."].)  Thus, nothing in common usage dictates that when a county's right of action "continue[s] as" a lien, the antecedent right of action ceases permanently to exist. Accepting provisionally that the statute is ambiguous with respect to whether a county's right of action can survive the creation of a lien on the injured person's judgment, the ambiguity cannot be resolved within the four corners of the statute.  We therefore turn to such extrinsic indicia of legislative intent as we have found.

### D.  Words Not Chosen

Although the surest guide to legislative intent will almost always be the language actually used by the Legislature, it may also be useful to consider language *not* used, particularly when it appears that the Legislature could have easily expressed the intention for which a party contends.  (*In re Marriage of Smith* (1982) 135 Cal.App.3d 543, 551, fn. 15, 419, quoting Frankfurter, *Some Reflections on the Reading of Statutes* (1947) 47 Col.L.Rev. 527, 536 [" 'One more caution is relevant when one is admonished to listen attentively to what a statute says.  One must also listen attentively to what it does not say.' "]; see, e.g., *People v. Johnson* (2015) 60 Cal.4th 966, 991 ["If the Legislature had intended such a meaning, it could easily have said so."]; *Riverside County Sheriff's Dept.*

*v. Stiglitz* (2014) 60 Cal.4th 624, 632 [had Legislature intended to require certain motions to be heard in superior court, "it could easily have said so."]; *Flowers v. Prasad* (2015) 238 Cal.App.4th 930, 941-942 [if Legislature's intent was to bar disabled persons from seeking damages under statute, "it could have simply stated that prohibition"]; *MacIsaac v. Waste Management Collection and Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1086 ["The Legislature might easily have chosen to define 'layoff' in language that would yield MacIsaac's desired interpretation."].)

Here there are many ways the Legislature could have expressed the intention imputed to the statute by the trial court. It might have inserted the term "only," as we have already suggested. It might have used a term like "exclusive" to describe the lien remedy. It might have specified that the prescribed abatement of the county's right of action would end, and the right of action revive, only if the injured person's action terminated otherwise than by a judgment on the merits.

Perhaps the most concise means of expressing the intention found by the trial court would have been to say that upon entry of a judgment in favor of the injured person, a county's statutory right of action "merges" into the lien. This usage is common in several areas of civil procedure. Thus, under one aspect of res judicata doctrine, "a claim presented and reduced to judgment merges with the judgment and is thereby superseded. [Citation.] The claimant's remedy thereafter is to enforce the judgment; he may not reassert the claim." (*Passanisi v. Merit-McBride Realtors, Inc.* (1987) 190 Cal.App.3d 1496, 1510.) A similar usage appears in the concept of the merger of *estates*, under which two lesser interests in the same property may "merge" into a single greater interest when both become vested in the same person. (See *Davis v. Randall* (1897) 117 Cal. 12, 16-17 [noting limitations on rule].) A kind of hybrid of these usages appears in rules declaring that various types of liens, often auxiliary to collection of a debt or prospective judgment, "merge" into later arising liens, or the judgment engendering them. Thus an

20

attachment lien, which is imposed on specific property in a pending lawsuit to aid in enforcement of an eventual judgment, is said to be "merged in the lien of the judgment in the case of real property or with the lien of a writ of execution in the case of personal property." (*Durkin v. Durkin* (1955) 133 Cal.App.2d 283, 294; see *Balzano v. Traeger* (1928) 93 Cal.App. 640, 643; *Bagley v. Ward* (1869) 37 Cal. 121, 131; but see *Brun v. Evans* (1925) 197 Cal. 439, 442 ["it does not necessarily follow . . . that the attachment lien becomes so completely extinguished thereby that it cannot thereafter be revived or 'unscrambled' from the judgment under any circumstances or for any purpose"]; cf. *Riley v. Nance* (1893) 97 Cal. 203, 204-205 [attachment lien could not merge into judgment lien, and thus was not extinguished as to particular property, where defendant conveyed property to a third party during suit].)

None of these rules applies here by its own terms. When this action was filed, neither County's right of action nor its lien could have merged into a *judgment*, for County had never obtained a judgment; it possessed only an abated right of action against Fresh Express, and a lien on *Escobar's* judgment. Nor was there any second estate into which County's lien could merge. We allude to these rules only because if the Legislature had wished to make the statutory lien a county's exclusive remedy against a tortfeasor, the language of merger would have been a concise way of doing so. The Legislature is certainly familiar with this terminology; it has declared on several occasions that certain auxiliary liens will *not* merge into a judgment. (E.g., Civ. Code, § 3061.6, subd. (e) [suit may be brought on debt giving rise to agricultural laborer's lien, "and the judgment . . . shall not be construed to impair or merge any lien held by the plaintiff"]; Civ. Code, § 3065a [same, logger's lien]; Civ. Code, § 8468, subd. (b) [mechanic's lien]; Food & Agr. Code, § 55648 [agricultural producer's lien]; Food & Agr. Code, § 55703 [lien on livestock sold to meatpacker].) It has used this terminology similarly in other contexts. (E.g., Fam. Code, § 2128, subd. (b) [preserves "contract

21

remedies" in context of marital dissolution "where the contract has not been merged or incorporated into a judgment"]; Pub. Res. Code, § 5003.7, subd. (c) [state park department's lien on property for unpaid utility services "continue[s] in effect for four years . . . unless sooner extinguished by payment, satisfaction, or merger in judgment of foreclosure"].) And this terminology appeared in statutes long before 1967, when section 23004.1 was adopted. (See Stats. 1951, ch. 1159, § 1, pp. 2954-2955 [enacting former Code Civ. Proc., § 1200, predecessor to Civ. Code, § 8468, subd. (b), concerning mechanic's lien]; Stats.1939, ch. 828, § 10, p. 2408, enacting former Agr. Code, § 1300.9f, predecessor to Food & Agr. Code, § 55648, concerning agricultural producer's lien]; Stats.1927, ch. 505, § 2, pp. 849-850 [enacting Civ. Code, § 3065a, concerning logger's lien ].)

In short, the Legislature had a variety of verbal formulas at its ready disposal to declare, if it wished, that once attached to a judgment, a county's statutory lien became its only remedy against a tortfeasor. It employed none of them. Of course, as we have acknowledged, things the Legislature did *not* say will often provide a slender reed on which to rest the interpretation of a statute. But when a variety of familiar constructions were readily available to express the meaning asserted by a party, the Legislature's failure to adopt any of them is some indication that it did not intend the statute to convey that meaning.

### E. *Statutory Purpose and Reasonable Consequences*

A more potent tool for ascertaining the intended effect of a statute is to consult its purpose and the reasonableness of the consequences flowing from competing constructions. "To the extent th[e] examination of the statutory language leaves uncertainty, it is appropriate to consider 'the consequences that will flow from a particular interpretation. [Citation.]' [Citation.] Where more than one statutory construction is arguably possible, our 'policy has long been to favor the construction that

22

leads to the more reasonable result. [Citation.]' [Citation.] This policy derives largely from the presumption that the Legislature intends reasonable results consistent with its apparent purpose. [Citation.] Thus, our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results. [Citations.]" (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291, quoted in *Yassin v. Solis, supra,* 184 Cal.App.4th 524, 532.)

The manifest purpose of section 23004.1 is to provide counties with a source of recompense for the expenses incurred by them—and their taxpayers—in providing medical services necessitated by tortious conduct. This qualifies the statute as remedial in character, and calls for its liberal construction in aid of the remedies thus granted. (See *Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1597, quoting *Rich v. Maples* (1867) 33 Cal. 102, 106 [" 'A remedial statute is one which provides a means for the enforcement of a right or the redress of a wrong.' "]; *id.* at p. 1598, quoting *Tintocalis v. Tintocalis* (1993) 20 Cal.App.4th 1590, 1592 ["A remedial statute ' "must be liberally construed 'to effectuate its object and purpose, and to suppress the mischief at which it is directed.' " ' "].)[11] At least when the person treated lacks the means to pay for the

---

[11] The Legislature adopted several measures with the manifest purpose of avoiding draconian applications of the statute. One of these is to limit the county's recovery to the "reasonable value of the care and treatment so furnished." (Section 23004.1, subds. (a), (b).) Another is to declare the county "subrogated to any right or claim" brought by the injured person—implying that, in some situations at least, the county's rights are subject to limitations on the doctrines surrounding equitable subrogation. (*Id.*, subd. (a); see *State Bar of California v. Statile*, *supra*, 168 Cal.App.4th 650; pt. I, *ante*.) Of course, as we have noted exhaustively, the county's entitlement to sue in its own right "abate[s] during the pendency of [the injured person's] action." (Section 23004.1, subd. (b).) And the county is expressly authorized to forego recovery under the statute, in whole or part, if its governing body "determines that collection

23

services thus rendered, it might be said that the county and its taxpayers themselves become victims of the tort.  It is thus fitting that if the tortfeasor is able to respond in damages, he or she is called upon to compensate the county for these expenses, whether or not the injured person elects to bring suit.[12]  Obviously this purpose is ill served by permitting the tortfeasor to excuse itself from this obligation by turning control of the claimed funds over to the injured patient.  The intent of the statute is best effectuated by providing counties with a straightforward remedy against the recalcitrant tortfeasor *cum* judgment creditor.

Fresh Express contends, however, that such a reading would place it, and other similarly situated tortfeasors, in an untenable position.  According to Fresh Express, it "faced multiple obligations concerning the need to satisfy the Escobar judgment and resolve claimed liens from the County and multiple medical providers.  Fresh Express' first obligation pursuant to the verdict and judgment was, of course, to satisfy the judgment itself.[13]  If Fresh Express had written a check directly to the County for the full amount of the medical lien (as the County argues it should have), *the Company would not have obtained a Satisfaction of Judgment and would have been exposed to additional costs related to judicial enforcement of the judgment*, including accruing interest charges.

---

would result in undue hardship upon the person who suffered the injury or disease . . . ." (Gov. Code, § 23004.2, subd. (a).)

[12]  If the injured person does bring suit, of course, the medical expenses he or she has incurred will become an element of special damages which—if he or she prevails—will be awarded in the judgment.  (See *Reichle v. Hazie* (1937) 22 Cal.App.2d 543, 547-548.)  The effect of the statutory lien is simply to carve out that portion of the award and require its payment to the county, rather than force the county to pursue a collection action against the injured person.

[13]  As further discussed in *Escobar II, supra*, H038185, Fresh Express has *not* in fact satisfied the judgment, since it paid a portion of it in a check that could not be, and presumably has not been, negotiated.  (See Code Civ. Proc., § 724.010, subd. (c).)

24

Conversely, if Fresh Express merely paid Escobar the full amount of the total judgment, the Company would have ignored its obligations to the lien claimant, the County. [¶] In an effort to fashion an efficient satisfaction of the judgment, Fresh Express issued a check to Mr. Escobar for the amount of the judgment exclusive of the amount of the County's medical lien. Fresh Express then issued a check to both the County and Mr. Escobar's counsel for the amount relating to the medical charges by the County. [Record citation.] Fresh Express acted with the reasonable understanding that Mr. Escobar's counsel and the lien claimant would then divide up the amount of that check . . . ." (Italics added.) In its brief in one of the related appeals, Fresh Express concludes a similar discussion by asserting that section 23004.1 "could not have been intended to result in the illogical and perverse conclusion of having a third party tortfeasor 'double-pay' a judgment related to the medical services provided by the County."

We agree that the Legislature could not have intended to require a tortfeasor in Fresh Express's position to pay the plaintiff's medical expenses twice—once to the plaintiff, and again to a county lienholder. Nor does a proper construction of section 23004.1 require a judgment debtor such as Fresh Express to entangle itself in disputes between a county lien claimant and the injured plaintiff over the county's recovery. But it does not follow that the Legislature meant to permit judgment debtors like Fresh Express to wash their hands of the matter by simply turning the funds over to the injured plaintiff. Rather it could quite reasonably intend that a party in Fresh Express's position would remain liable on the underlying statutory obligation unless and until the county lienholder's claims were resolved. Without the threat of such continuing liability, there would be no incentive for a judgment debtor to comply with a county's lien, and it might safely be anticipated that no plaintiff would ever cooperate in such compliance when it could instead, as Escobar has done here, cast the county into procedural limbo in hopes of driving down the size of its claim.

25

Thus, while we agree that Fresh Express should have been able to disentangle itself from any dispute between Escobar and County, and to obtain a satisfaction of judgment by paying the full amount of the judgment, we cannot agree that it could accomplish these objectives by simply writing a check payable to both of the competing claimants. There were and are far more suitable remedies for one in Fresh Express's situation. It has simply failed to avail itself of them.

First, with respect to Fresh Express's supposed plight as the target of conflicting claims by Escobar and County, our codes provide a procedure tailored to precisely such situations: "[W]henever conflicting claims are or may be made upon a person for or relating to personal property, or the performance of an obligation . . . such person may bring an action against the conflicting claimants to compel them to interplead and litigate their several claims." (Code Civ. Proc., § 386, subd. (a).) Similarly, "Any person . . . against whom double or multiple claims are made . . . such that they may give rise to double or multiple liability, may bring an action against the claimants to compel them to interplead and litigate their several claims." (*Id*., subd. (b).) The plaintiff-in-interpleader may then deposit the disputed funds into court (*id*., subd. (c)), and upon establishing that it is a "mere stakeholder," may "apply to the court for an order discharging [it] from liability and dismissing [it] from the action" (Code Civ. Proc., § 386.5).

Interpleader was the remedy employed in *State Farm Mutual Automobile Insurance Co. v. Huff* (2013) 216 Cal.App.4th 1463 (*Huff*), by a liability insurer in a position analogous to that of Fresh Express here. The insurer found itself the target of conflicting claims by an injured claimant and a hospital district seeking to enforce its lien under the Hospital Lien Act (HLA) (Civ. Code, §§ 3045.1-3045.5). Although the opinion does not explicitly disclose the fate of the insurer, it states that after the interpleader action was filed, "[t]he conflicting claims of [the claimant] and the [d]istrict . . .

26

proceeded to a bench trial." (*State Farm, supra,* at p. 1467.) Presumably the insurer was—as it should have been—relieved of any further obligations in the matter.

Second, with respect to obtaining a satisfaction of judgment, we see no reason to doubt that a stakeholder in Fresh Express's position, having duly invoked the foregoing remedy, would also be entitled to a satisfaction of judgment. If there were no dispute as to the amount of the lien, Fresh Express would satisfy the judgment by paying the full amount of the lien to County and paying the rest of the judgment to Escobar. This would constitute "payment of the full amount required" by the judgment, and thus would effect its satisfaction. (Code Civ. Proc., § 724.010, subd. (a).) Fresh Express seems to assume that in order to establish its discharge of all obligations under the judgment, it had to satisfy Escobar (or more realistically, his attorney), which it could not do without surrendering control of the disputed funds to him. But Escobar was *under a duty* to acknowledge satisfaction "immediately" upon its occurrence. (Code Civ. Proc., § 724.030.) If he failed to perform that duty, Fresh Express would become entitled to demand compliance and, failing that, to move the court to compel compliance. (Code Civ. Proc., § 724.050, subds. (a), (d).) If the court found that the judgment had been satisfied, it could either order Escobar to acknowledge satisfaction, or direct the clerk to enter satisfaction of judgment. (Code Civ. Proc., § 724.050, subd. (d).) In either case, if Escobar's failure to comply was found to be "without just cause," he would be "liable to [Fresh Express] . . . for all damages sustained by reason of such failure," and would be required to "forfeit one hundred dollars" to Fresh Express (Code Civ. Proc., § 724.050, subd. (e)), and, potentially, to absorb Fresh Express's attorney fees (Code Civ. Proc., § 724.080).

We have no doubt that these same remedies would be available to a judgment debtor who duly invoked the remedy of interpleader with respect to portions of the judgment that were subject to conflicting claims. The deposit of the disputed funds,

27

coupled with the payment of undisputed funds as directed by the judgment, would also constitute "payment of the full amount required" by the judgment, and thus would entitle the judgment creditor to an acknowledgment or certification of satisfaction (Code Civ. Proc., § 724.010, subd. (a)) in addition to excusing it from further involvement in the dispute over the deposited funds. To the extent that Fresh Express now finds itself in an uncomfortable strait, it is because it failed to avail itself of the escape routes provided by the code. It cannot invoke the resulting hardship as a basis for limiting County's statutory rights. The relief from its supposed dilemma does not lie in an untenable construction of section 23004.1.

## F. *Legislative History*

We have found no pertinent direct evidence of legislative intent, e.g., committee or other reports accompanying the enactment of section 23004.1.[14] However, we can draw some inferences from four bodies of evidence: the history of amendments to the bill prior to its adoption; a comparison of this statute with the HLA, adopted six years earlier; and enrolled bill reports concerning a nearly identical provision adopted within a few days of section 23004.1.

As originally proposed, the bill giving rise to section 23004.1 did not grant counties either a lien or an entirely independent cause of action. Instead it granted a right to "intervene or join" in any action brought by the injured person, and to bring an action against the tortfeasor only if the injured person did not institute suit within six months of the treatment furnished. (Sen. Bill No. 893 (1967 Reg. Sess.), as introduced Apr. 6, 1967, § 1.) The bill was then amended to grant the county, in addition to its own right of action, a lien on the injured person's judgment. (Sen. Bill No. 893 (1967 Reg. Sess.), as

---

[14] The only legislative history we have found is the governor's chaptered bill file, in which we find nothing bearing on the intended relationship between the abatement clause and the lien clause.

28

amended May 23, 1967, § 1.)  The amendment further provided that the county could "enforce such lien in a separate action."  (*Ibid.*)  The next amendment conditioned the lien upon the injured person's bringing suit, and added the provisos that (1) the county's right of action "shall abate during the pendency of such action," and (2) would "continue as a first lien against any judgment recovered by the injured or disabled person . . . ." (Sen. Bill No. 893 (1967 Reg. Sess.), as amended Jun. 20, 1967, § 1.)  It also eliminated the provision expressly authorizing a "separate action" to enforce the lien.[15]  (*Ibid.*)  The remaining amendments have no apparent relevance here.[16]

The deletion of the provision for lien enforcement "in a separate action" suggests two competing hypotheses:  either the Legislature meant to *deny* counties a right to enforce the lien in a separate action; or it considered the grant of such a right *superfluous* once the statute was amended to declare that the county's own right of action "abate[d] during the pendency" of the injured person's action.  We think the latter inference is by far the more reasonable of the two.  None of the materials before us, admissible or otherwise, suggests any reason for the Legislature to limit a county's power to enforce the lien granted by the statute.  In contrast, the circumstances readily suggest grounds for the Legislature to deem an explicit grant of such power unnecessary and potentially

---

[15]  Somewhat curiously, the Legislative Counsel's digest of the bill as ultimately enacted continues to state that it "provides that county may enforce such lien in a separate action."  (Leg. Counsel's Dig., Sen. Bill No. 893 (1987-1988 Reg. Sess.), 4 Stats. 1987, Summary Digest, p. 5216.)  While this may be attributable to oversight, it certainly militates against the idea that the statute was understood to preclude further litigation against the tortfeasor after entry of the underlying judgment.

[16]  One amendment made the statute effective only in counties which had elected to be governed by its provisions.  (Sen. Bill No. 893 (1967 Reg. Sess.), as amended Jun. 26, 1967, § 3; see Gov. Code, § 23004.3.)  The final two amendments required the county to give notice of the lien to the tortfeasor's insurance company, if known.  (Sen. Bill No. 897 (1967 Reg. Sess.), as amended Jul. 14, 1967, § 1; Sen. Bill No. 893 (1967 Reg. Sess.), as amended Aug. 2, 1967, § 1.)

mischievous. Having limited the duration of the abatement of the county's right of action to coincide with the pendency of the injured person's action, the Legislature could quite reasonably expect that the right would be revived if the county did not obtain satisfaction through its lien. Given such an expectation, the Legislature could quite reasonably fear that the specification of a particular enforcement mechanism—i.e., an "separate action" on the lien—would imply the withholding of other remedies, such as a suit on the original right of action. This could be especially pernicious given the absence of any prescribed or previously settled means of enforcing the lien. The uncertainty, confusion, and waste of resources attendant upon such a regime are illustrated by this very case, in which two parties who clearly owe County money have both avoided paying anything for a number of years, essentially by playing competing remedies off against each other in two different courts.

The simplest and most direct solution to such difficulties would be, and we believe was, to put the burden on the tortfeasor/judgment debtor to either satisfy the county's demands or face a new or revived suit on the county's statutory cause of action. Anticipating that its enactment would be so construed and applied, the Legislature quite prudently omitted any reference to a suit to enforce the lien.

This inference is bolstered, in our view, by the contrast between section 23004.1 and the HLA. Both statutory schemes provide remedies, including lien rights, to an entity that provides medical treatment to a person who is unable to pay, where a third person is liable for the injury giving rise to the treatment. But each employs different mechanisms to strike a balance among the interests affected.[17] The lien granted by the

---

[17] It appears that a county could invoke both remedies in a proper case. (See Civ. Code, § 3045.1 [making HLA available to "[e]very . . . public entity, or other institution or body maintaining a hospital"]; e.g., *County of San Bernardino v. Calderon* (2007) 148 Cal.App.4th 1103; *Newton v. Clemons* (2003) 110 Cal.App.4th 1.)

30

HLA attaches to a "judgment, settlement, or compromise" (Civ. Code, § 3045.2), whereas the lien under section 23004.1 attaches only to "a[] judgment" and not to funds received in settlement (§ 23004.1, subd. (b); *Mares v. Baughman*, *supra*, 92 Cal.App.4th 672, 679; *Newton v. Clemons, supra,* 110 Cal.App.4th 1, 8-9). However the HLA has been construed by the Supreme Court to limit recovery on the lien to 50 percent of the injured person's recovery. (*Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 601 (*Parnell*), citing *Newton v. Clemons*, *supra*, 110 Cal.App.4th 1, 6, & Civ. Code, § 3045.4; accord, *Huff, supra,* 216 Cal.App.4th 1463, 1470.) No such limitation appears in section 23004.1 or related statutes. Further, the HLA "does not give a hospital an independent cause of action against the third party tortfeasor," but generally allows recovery only from " 'damages recovered' by the patient from a third party tortfeasor." (*Parnell*, *supra*, 35 Cal.4th at p. 603.) However, the HLA expressly entitles the hospital to proceed directly against a tortfeasor who *pays the injured person without honoring the lien*. (Civ. Code, § 3045.4; see *Parnell*, *supra*, at p. 608 [noting contrast between the two acts in this regard].)[18]

The interpretation of section 23004.1 advocated by Fresh Express and adopted by the trial court would make another distinction between the remedies afforded by the two acts: whereas the HLA imposes *direct liability* on a tortfeasor for failing to honor a lien under that act (Civ. Code, § 3045.4), the tortfeasor who ignores a lien under section 23004.1 would be subject only to some undefined proceeding to *enforce the lien*. The trial court apparently supposed, for unexplained reasons, that such a proceeding could take place only in the court that rendered the underlying judgment. But that is the

---

[18] As relevant here, Civil Code section 3054.4 provides, "Any person . . . making any payment to the injured person . . . for the injuries he or she sustained, after the receipt of the notice as provided by Section 3045.3, without paying . . . [the lienor] the amount of its lien . . . shall be liable to the [lienor] . . . for the amount of its lien . . . ."

least of its inadequacies.  Because of the peculiar nature of the statutory lien, there is simply no clear guidance in statute or precedent concerning methods for its "enforcement."  Under the trial court's reading, the county would have no assurance that its statutory rights could be vindicated at all—let alone that they would be vindicated in an expedient or efficient manner.

This stark discrepancy between the HLA and Section 23004.1—as construed by the trial court—is readily eliminated by taking the abatement clause at face value and holding that a county's right of action is revived if, after the injured person's suit concludes, the county's demands have not been satisfied or otherwise resolved.  Again, such a rule would have the salutary effect of bringing the tortfeasor, the injured person, and the county to the table to negotiate an outcome agreeable to all; failing that, it would provide a strong incentive for the tortfeasor *qua* judgment debtor to deposit the disputed funds in court, require the injured person and the county to litigate their competing claims, and demand that its own liability on the judgment be declared satisfied.  The trial court's interpretation, in contrast, is destined to generate precisely the kind of delay, confusion, and waste reflected in this and the two related appeals.

Finally we note that the Legislature used the same construction at issue here in former Welfare and Institutions Code section 14417, which was enacted three days before section 23004.1.  (Stats. 1967, ch. 1424, § 1, p. 3350, adopted Aug. 25, 1967; cf. Stats. 1967, ch. 1495, § 1, pp. 3492-3492, adopted Aug. 28, 1967.)  In its original form, that statute granted the state a right of action against any person civilly responsible for inflicting injuries for which Medi-Cal benefits had been paid.  (See *City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 123 (*Sweet*).)  Like section 23004.1, it provided that if a beneficiary filed suit, the state's "right of action shall abate during the pendency of such action, and . . . continue as a first lien against any judgment recovered by the injured person . . . ."  (See Stats. 1967, ch. 1424, § 1, p. 3350.)

32

Unfortunately, before that statute could be judicially construed the quoted provision was replaced by one substituting other remedies for the original ones. (Former Welf. & Inst. Code, § 14417, as enacted by Stats. 1969, ch. 1420, § 2, p. 2910, discussed in *Sweet*, *supra*, 12 Cal.4th at p. 123; see now Welf. & Inst. Code, §§ 14124.70 et seq.) In connection with the 1967 enactment, however, two executive branch offices submitted enrolled bill memoranda to the Governor stating that the bill authorized a direct action and "*also* gives . . . [a] . . . lien." (Office of Health Care Services, Enrolled Bill Analysis of Sen. Bill 1277 (1967-1968 Reg. Sess.) Aug. 23, 1967, p. 1, italics added; Legis. Liaisons to Senat and Assembly, Bill Memorandum re Sen. Bill 1277 (1967-1968 Reg. Sess.) Aug. 23, 1967, p. 1 [same]; cf. Revenue and Management Agency, Memorandum on Sen. Bill 1277 (1967-1968 Reg. Sess.) Aug. 21, 1967, p. 1 ["The recovery can be made directly against the liable third party or through a lien against any settlement between the injured party and the responsible third party."].) Although such materials "do not take precedence over more direct windows into legislative intent," and "cannot be used to alter the substance of legislation," they may be " 'instructive' in filling out the picture of the Legislature's purpose." (*In re Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3.) Here they suggest that the lien remedy was viewed as cumulative of, or at worst an alternative to, the cause of action. Nothing we have found suggests that the Legislature intended the lien to *supersede* the cause of action.

We conclude that County's right of action under section 23004.1 survived the attachment of its lien and that County was entitled to revive it, as it sought to do here, when Fresh Express surrendered control of the liened funds to Escobar's attorney. It follows that the trial court erred by sustaining Fresh Express's demurrer and that the judgment predicated on that ruling must be reversed.

33

### *III. WCAB Jurisdiction*

Fresh Express also contends that County's right to relief is constrained by the exclusive remedy provisions of the Workers' Compensation Act. Fresh Express asserts that "the WCAB has exclusive jurisdiction over medical liens" and that the amounts recoverable by medical lienholders are limited to those allowed in the WCAB's medical fee schedules. The identical contention is asserted by Escobar in *Escobar III, supra,* H039600. As the person claiming to have suffered an industrial injury, he has a stronger argument than anything Fresh Express—a third-party tortfeasor and judgment debtor— can make. For reasons explained at length in our opinion in that matter, we have concluded that the workers' compensation laws pose no impediment to County's claims against Escobar. A fortiori, they pose no impediment to its claims against Fresh Express.

### DISPOSITION

The judgment is reversed with directions to overrule the demurrer. On remand, Fresh Express may wish to commence a proceeding in interpleader to extricate itself from this dispute. County will recover its costs on appeal.

34

_____
                  RUSHING, P.J.

WE CONCUR:

_____
      PREMO, J.

_____
      ELIA, J.

*County of Santa Clara v. Escobar et al.*
**H038121**

35

Trial Court:                              Santa Clara County Superior Court
                                          Superior Court No.:  1-11-CV201680


Trial Judge:                              The Honorable Patricia M. Lucas


Attorneys for Plaintiff and              Orry P. Korb,
Appellant County of Santa Clara:         County Counsel

                                         Lori E. Pegg,
                                         Acting county Counsel

                                         Shephen H. Schmid,
                                         Deputy County Counsel

                                         Marcy L. Berkman,
                                         Deputy County Counsel


Attorneys for Defendant and              Law Offices of Carcione, Cattermole,
Respondent Javier Escobar:               Dolinski, Stucky, Markowitz & Carcione

                                         Joseph W. Carcione, Jr.
                                         Joshua S. Markowitz


Attorneys for Defendant and              Burnham Brown
Respondent Fresh Express, Inc.
                                         Robert M. Bodzin
                                         Raymond A. Greene, III


*County of Santa Clara v. Escobar et al.*
**H038121**